306 F.2d 334
 45 P.U.R.3d 100
 H. L. HUNT; W. H. HUNT, Trustee for Hassie Hunt Trust;
Caroline Hunt Sands; J. A. Goodson, Trustee for Caroline
Hunt Trust Estate; A. G. Hill, Trustee for Lamar Hunt Trust
Estate; Nelson Bunker Hunt, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 19065, 19113, 19114, 19153-19156, 19212-19214.
 United States Court of Appeals Fifth Circuit.
 July 19, 1962.
 
 Robert E. May, Richard F. Generelly, Washington, D.C., Robert W. Henderson, Thomas G. Crouch, Robert M. Kennedy, Dallas, Tex., May, Shannon & Morley, Washington, D.C., for petitioners.
 Howard E. Wahrenbrock, Sol., Milton J. Grossman, Arthur H. Fribourg, Attys., John C. Mason, Ralph S. Spritzer, Gen. Counsel, Robert L. Russell, Asst. Gen. Counsel, E.P.C., Washington, D.C., for Federal Power Commission.
 Before BROWN, WISDOM and BELL, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 These cases raise the common question of whether the Federal Power Commission in granting a temporary certificate for the sale of natural gas at a specified initial sales price may lawfully prescribe as a condition that such price may not be increased without express approval of the Commission. The effect of such a condition is to deny to the producer the opportunity of filing a 4(d)(e) subsequent rate increase. We hold that the Commission may not thus effectually condition-out a statutory right which Congress has prescribed. We therefore sustain the attack of the Producers who petition for review and reverse the Orders of the Commission.
 
 
 2
 While this question is almost submerged in the seemingly unavoidable flood of papers which consumes another natural resource while adjudicating this one, each of these ten separate petitions for review and the underlying orders, petitions for rehearing, orders on rehearing, and post-certification orders present substantially the same facts. Fourtunately, what we can readily identify as the natural gas Bar, shows a commendable cooperation in streamlning into a single consolidated record and consolidated briefs and argument all of the essential materials-- but no more-- without costly repetition or duplication.[1]
 
 
 3
 While, as we stated, these involve many different dockets concerning rates or sales in the Alvin, Alta Loma and Chenango Fields within the Texas Railroad District No. 3, for all practical purposes the cases are the same and present this one basic question. Moreover, very little factual detail even as to a typical case is needed. Some dates and times are, however, important in showing the sequence and to pinpoint the complaints of the Producer. A brief synopsis of the Alta Loma proceedings will suffice.[2]
 
 
 4
 On July 1, 1960, the Commission issued a permanent certificate under 7(e) to the Producer for the sale of gas to the pipeline purchaser. The rate prescribed was 20cents Mcf. The 20-year contract as originally proposed called for an initial price of 20cents with four escalations of 2cents each every four years. In granting the permanent certificate, the Commission required that this be altered by prescribing a single 3cents escalation at the end of the first ten years. This was accepted and service commenced. That Order, as such, is not under review in these cases.
 
 
 5
 Thereafter new production was brought in on this pooled gas unit. On December 15, 1960, the Producer entered individual gas sales contracts with the Pipeline purchaser for the sale of this additional gas. The price fixed was 20cents Mcf, but with four 2cents escalations.[3] Thereafter on February 27, 1961, the Producer applied to the Commission for a Certificate of Public Convenience and Necessity to make these sales. It sought also temporary authorization to begin service immediately, alleging the existence of an emergency situation resulting from 'the necessity of paying shut-in royalties and the incurrence of drainage through sales by others to pipeline companies other than' the pipeline Purchaser.[4]
 
 
 6
 It is helpful to digress here to point out two things. First, while the initial price, 20cents Mcf was the same as the currently effective permanent certificate covering gas from the same field to the same pipeline Purchaser, the escalation provisions were markedly different, and on a total weighted average the price was greater. Second, and of more importance, between the date of the issuance of the permanent certificate covering the sale of gas from this same field to the same pipeline Purchaser, the Commission issued its Statement of General Policy No. 61-1, 18 CFR 2.56, 24 FPC 818. In this Statement it established area price standards to be used as guides in determining where the proposed initial rates should be certificated without a price condition. The 'initial service rate' established Texas Railroad District No. 3 was 18cents Mcf. Of course the application of February 27, 1961, was for a new certificate and was a transaction expressly envisaged by 61-1. No reference in the application was made by the Purchaser to Statement 61-1 and, oddly enough, none was made in these terms by the Commission until long after the petition for review machinery had been set in motion by the Producer.
 
 
 7
 Presumably in the usual form and without the statement of any reasons, the Commission by letter order of April 7, 1961,[5] issued the temporary authority to sell the gas as proposed in that docket, but 'subject to the following conditions' which for ease of reference we identify in brackets (1), (2) and (3):
 
 
 8
 (1) That the total initial price not exceed 18 cents per Mcf at 14.65 psia;
 
 
 9
 (2) that there be filed within 20 days a supplement to the rate schedule consistent with (1) above and a revised billing statement;
 
 
 10
 (3) that the temporary authorization be accepted in writing by a responsible official of the company.
 
 
 11
 On May 5, 1961, the Producer filed its acceptance of this temporary authority but without prejudice to a claimed right to seek removal of conditions (1), (2) and (3) and to seek an increased rate in accordance with terms of the amended rate schedule filed contemporaneously. Filed presumably in compliance with Condition (2) was a contract amendment stating that the initial price would be 18cents Mcf for the first thirty (30) days following commencement of deliveries and thereafter 20cents. Deliveries had, in the meantime, commenced under the temporary authorization on April 19, 1961. Contemporaneously with the filing of its acceptance, the Producer also formally sought rehearing of the Order of April 7 imposing conditions (1), (2) and (3).
 
 
 12
 Again we digree to point out that the Commikssion did more than deny the petition for rehearing. It changed its Order of April 7 substantially. This action forms an additional complaint of the Producer here. That action was taken on May 31, 1961. That Order (a) denied the application for rehearing, and (b) rejected the amended rate schedule on the ground it appeared to authorize an increase from the 18cents rate during the continuance of temporary authorization. Then, to remove doubt it (c) expressly modified the language of the authorization to provide explicitly that no change from the 18cents rate could be made during its term.[6] And, finally, because of (b) and (c), the Order (d) rejected a proposed filing of a 20cents rate made in accordance with the amended contract.[7]
 
 
 13
 The Producer filed a timely application for rehearing of the Order of May 31 and shortly thereafter formally retendered its acceptance of the temporary authorization and also the increased-rate filing to 20cents. On July 26, 1961, the Commission denied the application for rehearing and rejected the retendered increased-rate filing.[8] Timely petitions to review the Commission Order issuing temporary authorization subject to conditions and the Commission Order rejecting the Producer's purported acceptance, its filing of an amended rate schedule, and its filing of increased rates were thereafter filed.
 
 
 14
 While that ordinarily would be the cutoff date, the record as certified shows that subsequent action was taken by the Commission. On November 2, 1961, the Commission sent the Producer a Letter Order which amplified its previous orders and modified them on one respect. This letter undertook to state reasons for the prior action generally in terms that the imposition of the 18cents price condition was taken in keeping with policy Statement No. 61-1. It further sated that upon reconsideration, the Commission had determined that it should permit the filing of the contract amendment which it had rejected earlier. This was, the Commission explained, merely to afford a contract basis for the collection of the authorized 18cents rate. It was made clear, however, that this was 'for the express purpose of permitting there to be on file the contractual agreement between you and (the pipeline Purchaser) under which you will be receiving 18cents per Mcf.' And it sounded the warning that 'this should not be construed as permission for you to file for an increased rate pursuant to section 4(d) of the * * * Act during the pendency of the temporary authorization.' The Commission thus made plain that in the new condition of the Order of May 31, 1961,[9] it was speaking precisely in terms of the use of the statutory right to file rate increases under 4(d) of the Act.[10]
 
 
 15
 The Producer asserts three principal complaints, the first two of which we think have no merit.
 
 
 16
 There is, first, the contention that after the grant of temporary authorization by the Order of April 7, 1961, imposing its Conditions (1), (2) and (3), the Commission could not make these conditions more onerous by its Order of May 31. It emphasizes two things, one of which is that condition (1) spoke precisely in terms of the 'initial price' not exceeding 18cents, the other being that it commenced deliveries on April 19, 1961. The suggestion seems to be that this is too much changing of the rules in the middle of the game. There is nothing to this. The Producer sought a change in the The Producer was unhappy with the Order of April 7 and-- by its conditional acceptance with express reservation of rights and its simultaneous application for rehearing-- sought to obtain a new ruling by the Commission. If anything as fresh as the Order of April 7, 1961, had to have anything to keep it alive as a matter within the continued recosideration of the Commission at least during the 60-day period allowed for appeal to the Court of Appeals, the application for rehearing was more than enough. The petition for rehearing is not a one-way street. It seeks a reconsideration. A reconsideration carries with it the imminent prospect that things will be worse, not better, after rehearing.
 
 
 17
 Somewhat akin to this criticism is the further procedural one that the Letter Order of November 2, 1961, is of no conseqence in this record. The Commission asserts that since this occurred prior to its certification of the record, the Commission continued to have jurisdiction. 19(b), 15 U.S.C.A. 717r(b). But we do not have to decide this specifically. The reasons asserted, perhaps retrospectively, in support of its May 31 modification is but a forecast of the rationale elucidated by the General Counsel to sustain the Order. In any case, it is the Order that is in issue. What the Commission says, as with the Court's opinion, is of great importance and its intrinsic weight is not affected by the time of its deliverance when, as was the case here, it is on a temporary certificate, as to which no formal record is or can be made. So far as the modification which allows the filing of the amended contract, previosuly rejected by the Commission, is concerned we regard that as an accomplished fact. It merely spells out what is otherwise so plain in the Commission's actions that it was permitting the sale under a contractual arrangement, but on the express positive condition that no increases in the rate would be allowed whether in, or not in, the contract.
 
 
 18
 The second complaint is more substantial. In effect it is that there was no reasonable basis for requiring a price reduction from 20cents to 18cents. If the Producer were to establish this contention, it is not likely that, at this juncture, we would even reach the problem of the prohibition of 4(d) increases.
 
 
 19
 Both as to the specific reduction in the initial sales price and in the related problem of requiring a price reduction-- as distinguished from collection of the contract price under an obligation to refund the difference-- great reliance is placed upon the decisions of the 10th and 7th Circuits in the cases reversing the BTU adjustment condition. The Pure Oil Co. v. F.P.C., 7 Cir., 1961, 292 F.2d 350; Sohio Petroleum Co. v. F.P.C., 10 Cir., 1961, 298 F.2d 465; Eason Oil Co. v. F.P.C., 10 Cir., 1961, 298 F.2d 468; and see also from the 3rd Circuit, J. M. Huber Corp. v. F.P.C., 3 Cir., 1961, 294 F.2d 568. For our present purposes, we can accept the standards elucidated in those opinions, but they do not compel any reversal here.
 
 
 20
 It is important to bear in mind a factor we discuss in greater detail later on. We are here dealing with termporary authorization. There is, and can be, no formalized record in the traditional sense. What tools are we to use, then, by which to construct a thesis showing that it was completely arbitrary for the Commission to have required an effective reduction in price? The Producer emphasizes the previous permanent certification of a 20cents rate in the related sale. But aside from whatever uncertainty is now cast upon that decision,[11] we think a good deal of water has gone over the dam which at an individualized look. One, of course, is the Policy Statement 61-1 with its area the Policy Statement 61-1 with its sarea pricing approach whose fetal development ought not to be imperiled by pre-natal traumas inflicted by restraints or restrictions from the judiciary. Equally important is the declaration from this and other Courts concerning the nature of the evidence required on the hold-the-line policy of CATCO.[12] In addition to these intervening events of considerable administrative-legal significance, the rates in all but the Chenango Field (see note 3, supra) carry ultimate rates considerably in excess of 20cents Mcf. We are asked on this skimpy record, unaided either by traditional evidence or that of expert economists, to say as a matter of law that a contract with four built-in 2cents escalations does not have an inflationary or triggering effect. On the assumption that the collection of the increases is ultimately allowed, it is quite plain that over the life of the contract the price for all gas delivered was 20cents plus. We would assume that what is so inescapable as a matter of economics would be understood in the same way by practical men in the business of selling and buying natural gas.
 
 
 21
 Nor do we find any basis for attacking the Commission's choice between a reduction in the initial price, rather than an order permitting collection of the contract rates subject to refund. There are a whole host of problems, legal and administrative, wrapped up in this choice. In the Commission's limited facility for study of the probable ultimate merits of a sale when considering an application for temporary authority, the circumstances would, we think, have to be quite unusual to warrant a Court differing with this conclusion inevitably calling for the nicest of expert judgments.
 
 
 22
 But we view the express prohibitions of 4 increases as beyond the pale of administrative discretion. We do not think that under the guise of a condition of a temporary authorization, the Commission can forbid what Congress has expressly allowed to natural gas producer. We reach this conclusion by application of the principles discussed and followed in Texaco, Inc. v. F.P.C., 5 Cir., 1961, 290 F.2d 149, and American Liberty Oil Co. v. F.P.C., 5 Cir., 1962, 301 F.2d 15. We do not, however, regard, as do the parties in various aspects, that either or both of these decisions is directly and positively controlling. As is perfectly plain, there is and must be a difference between a permanent certificate and a temporary authorization. Consequently, what is said in Texaco with regard to action permissible for a permanent certificate does not necessarily apply for a temporary.[13] On the other hand, the opposite is not necessarily true.
 
 
 23
 These cases start with the recognition that conditions may be imposed. And, of course, the factor deemed to be of such importance in CATCO was the beginning price. Thus, the Supreme Court held, the Commission, without making a rate case out of it, had the duty to take into account price as that might bear specifically, generally, immediately or remotely, on the public interest. In Texaco we did, of course, state that 'The power of the Commission to condition a certificate is co-extensive with its power to reject or deny a certificate * * * because the power to reject an application for certificate completely is harsher than the power to grant it on any reasonable condition,' 290 F.2d 149, 156. But we did not intend this to declare that since the Commission had it within its actual power not to grant an application, it could therefore imposed any conditions that, no matter how harsh in fact, were somewhat less than a complete refusal. We had earlier expressed it in terms such as these: '* * * it can hardly be argued that the Cimmission would not have had the power, if it made a soundly based finding that the public convenience and necessity did not warrant its granting of a certificate at an initial price higher than 17.7 cents, to deny the certificate out of hand.' 290 F.2d 149, 155.
 
 
 24
 The idea of reasonableness was therefore implicit in equating outright denial and grant subject to conditions. We spelled it out plainly in American Liberty where, of the grant of a temporary we declared, 'This is not to say that the Commission can act arbitrarily, whimsically or in a manner that amounts to a clear abuse of its discretion.' 301 F.2d 15, 18. Elaborating on this we then adopted as our own the standards suggested by the Commission. 'The reasonableness of the Commission's determination must be viewed in light of the summary and ex parte nature of a grant of such temporary authorization * * *' and '* * * the Commission's action * * * can be set aside only if the court were to determine that the order issuing a conditioned certificate was a clear abuse of discretion, i.e., arbitrary, whimsical, or capricious action, or that the order was otherwise as a matter of law erroneous on its face.' 301 F.2d 15, 18.
 
 
 25
 This envisages, of course, that there is a line past which the Commission may not go. The line is different for a permanent, rather than a temporary. The line may be a fuzzy one and difficult to locate. But somewhere there is a mark.
 
 
 26
 Up to now the line has not been permitted to go so far as to obliterate specific sections of the Natural Gas Act by requiring that one seeking to make an interstate sale must agree to forego and relinquish for an indefinite period of time safeguards and rights which Congress has established. On the contrary, what was done in Catco and by us in Texaco demonstrates that the necessity for conditioning a grant of a certificate is to fulfill the aims of the Act by an accommodation of all of its demands. Thus, the Court in Catco had this to say. 'In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act.' 360 U.S. 378, at 391, 79 S.Ct. 1246, at 3 L.Ed.2d 1312. In a very practical way we made just such an accommodation in Texaco. Thus, by rejecting a highly legalistic impediment supposedly founded on Mobile,[14] we categorically stated that the price condition in the certificate would not prohibit the producer from filing, as soon as the sales contract otherwise permitted, a rate increase under 4 which would thereafter be subject to suspension and collection under the obligation of reimbursement. This was a recognition that while, as a condition to a grant, the Commission would require the parties to commence the sale at a price lower than that fixed in the contract, the contract thereafter did not cease to have vitality. The socalled 'revision of the contract obligation' resulting from condition imposed by the Commission does not, we said, 'amount to a revision of the contract obligation of the parties between themselves except to the extent only that the Commission has a legal duty to deny the producers the right to receive, at least for a limited time, part of the benefits the parties have agreed among themselves it is entitled to.' 290 F.2d 149, 156.
 
 
 27
 Without even remotely implying that a permanent and a temporary are to be treated always alike, we can see no distinction in this area when viewed either as a matter of statutory power in the Commission or statutory rights accorded to a natural gas producer, or both. If, as we held may legally be done, the producer may increase rates and thereafter collect them subject to suspension and refund under 4, it is obvious that the Catco price 'line' sought to be maintained by the condition is not the one currently being observed after the permissible 4 increase. From the standpoint of the payments the purchaser is required to make, the actual price is in fact above the 'line.' Of course that makes maintenance of price line something less than completely effective. But that is the unavoidable consequence of a unique statutory regulatory scheme in which, as Mobile (see note 14, supra) points out, rates are initially prescribed (and increased) by private contract. Not everything is lost, however, since, as Catco contemplated, any contract increases are collected subject to refund. Additonally, this puts the burden of establishing lawfulness of the rates on the producer. Also it eliminates the prospect of irretrievable excess payments even though, in a lumbering and prolonged 5 rate investigations, the initial price is found to be too high. Viewed in this light we see no real distinction between a permanent and a temporary. Both in terms of the effectiveness and in terms of economic impact, the collection of a post-conditon 4 increase is the same for a temporary as for a permanent.
 
 
 28
 To allow this prohibition of 4 conditon, we would be as much as saying that in determining whether the addition of the proffered gas to the interstate market serves the public interest the rates to be prescribed are not those fixed under the sales contract by the parties. Rather the rates are those (a) fixed by the Commission in the first place and which are to continue until (b) the Commission itself fixes another level. This is a complete abandonment of the approach deliberately selected by Congress and which, all must agree, was a radical break with traditional utility-type regulation.
 
 
 29
 The consequences are too awesome for us to assume that Congress ever committed such undefinable legislative judgments to an administrative agency. There is, first, the status of the producer under a temporary. His rights may be temporary, but his duties are not, or at least on the present holding they are not. Like the ancient covenant running with the land, the duty to continue to deliver and sell flows with the gas from the moment of the first delivery down to the exhaustion of the reserve, or until the Commission, on appropriate terms, permits cessation of service under 7(b), 15 U.S.C.A. 717f(b). Sun Oil Co. v. F.P.C., 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639; Sunray Mid-Continent Oil Co. v. F.P.C., 1960, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623; Continental Oil Co. v. F.P.C., 5 Cir., 1959, 266 F.2d 208. That means that, for good or evil, a producer under a temporary is subject to all of the regulations, restraints and duties of a natural gas company, 2(6), 15 U.S.C.A. 717a(6). Nothing in 4 or in 7 outlining the grant of certificate, or anything elsewhere in the Act takes from such producer the rights as a natural gas company which the law accords as a part of the duties imposed. Such producer is required under 4(a) as a 'natural-gas company' to maintain 'just and reasonable' rules, regulations and rates, is forbidden under 4(b) to 'make or grant any undue preference' in 'rates, charges, services, facilities * * *' and under 4(c) is obliged to maintain and 'keep open * * * for public inspection its 'schedules showing all rates and charges for * * * sale * * *,' and under 4(d) to make no change, without Commission approval, except upon 'thirty days' notice.' Finally, the critical 4(e) prescribes that such proposed rate shall be in effect. It first provides that whenever a new rate is filed by a natural gas company 'the Commission shall have authority * * * to enter upon a hearing concerning the lawfulness of such rate * * * and, pending such hearing * * * may suspend the operation of such schedule and * * * rate, * * * but not for a longer period than five months * * *.' But it then goes on to provide that 'If the proceeding has not been concluded and an order made at the expiration of the suspension period * * *' then on motion of 'the natural gas company' the 'proposed * * * rate * * * shall go into effect * * *.'
 
 
 30
 Moreover, this subjugation of such a producer under a temporary to the almost perpetual control of the Commission is more than an academic theoretical. It is a clear and present-- and largely unavoidable-- fact. It is no reflection on the Commission or its over-burdened and energetic staff to take practical cognizance of the great delay in processing these matters. On the contrary, one can have only a genuine respect for the manner in which all grapple with this monumental and increasingly unmanageable task as the result of fallout from Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. But despite strenuous efforts and the importation of resourceful, new plans and methods for coping with it, the fact is that progress is slow, so slow indeed that it is hardly progress.[15]
 
 
 31
 Even from our remote position, it seems safe to conclude that never will the Commission be able to process certificates on an individualized basis. The hopes for a prectical solution must rest in generalized area-pricing or similar resourceful adaptations of law and life.[16] But assuming its legal validity will be upheld broadly enough to make it effective, even this can not be counted on for much immediate help. Speaking of this 'new system' of area pricing and the time before it can be established, Judge Prettyman stated (see note 16, supra), 'This period will be long, estimates running from four to fourteen years.'[17]
 
 
 32
 This is important for we have to view Commission action in terms of its broad and inescapable impact. It is no answer to the awesome implications thus revealed to suggest that as to these particular dockets, the Commission has, so we are informed, assigned them to a hearing which, perhaps by now has actually taken place. The problem presented in these hearings will be essentially the one presented in Catco and if it, and the many other numerous cases coming to this Court from the Commission, are any guide, it is almost certain that we are dealing with orders which cannot become final for two or three years more.[18] Time is therefore important. Time is a part of the problem for adjudication. In view of the structure of the Natural Gas Act, this time is irreplaceable to the producer. This is so even though the decision of the Commission on the grant of the permanent or, perhaps even later, in a 4 or 5 determination of just and lawful rates approves the proposed initial contract rate (or at least one higher than the conditioned rate).
 
 
 33
 And finally, the condition is so awesome because-- and it is no mere reductio ad absurdum to say-- if the Commission may set aside 4 and the rights, privileges and protections which it accords to a natural gas company subject to all of the obligations of the Act, then there is no end to the legislative tampering which the Commission may undertake. It may just as well deny the producer the right of review by rehearing or petition to the Courts under 19(b).[19] Or it might just as well conclude that the producer's operations are uneconomic because of doubtful reserves or a current exploration program and condition the grant of a temporary on divestment of unprofitable leases or the cessation of wildcat drilling.[20]
 
 
 34
 The condition is erroneous on its face and the cause must be reversed and remanded for further consistent proceedings.[21]
 
 
 35
 Congress has subjected a temporary natural-gas producer to 4 and all other parts of the Act. Congress has extended to all natural gas companies, permanent or temporary, the protection and rights of 4 and the Act. Each is interlocked.
 
 
 36
 That which Congress has joined together, let not the Commission put asunder.
 
 
 37
 Reversed and remanded.
 
 
 
 [1]
 The procedure worked out by trial and error and a good deal of give and take by the Solicitor of the Commission, counsel representing various parties and intervenors, and our Clerk over the past five years in the handling of these complicated records in natural gas cases is the source for our recently adopted rule prescribing a like optional procedure for general cases. The essence of it is that briefs are exchanged before the record is printed so that counsel, in thereafter jointly designating the printed record, know exactly what is, and is not, presented. Thus, in this case covering these ten dockets, plus another (No. 19,218), everything required is covered in 320 printed pages. This is a practice the Court encourages
 See Amended Rules 24(a), 5 Circuit, 28 U.S.C.A., effective as of June 1, 1962.
 
 
 [2]
 These are the subject of our dockets 19113 and 19214, and 19114 and 19213 concerning Commission Docket Nos. C161-1283 and 1282, respectively
 
 
 [3]
 It now seems to be agreed that, despite some ambiguous discrepancies, under the peculiar mechanics of certain adoptive contracts, the rates in the sales contract in Docket Nos. 19153, 19154, 19155, 19156 (covering Commission Dockets Nos. C-161-1343, 1344, 1345 and 1346) are 20cents with a single 3cents escalation at the end of ten years
 
 
 [4]
 This is a prerequisite to the invocation of the temporary-authorization provisions of 7(c) and Natural Gas Regulations 157.28(c), 18 CFR 157.28(c)
 
 
 [5]
 This Order ofApril 7 is the first Order under review in this proceeding. See note 8, infra
 
 
 [6]
 The letter Order of May 31 prescribed that condition (1) of the letter Order of April 7, 1961, was 'modified to read as follows:
 '(1) that the total initial price under this authorization shall not exceed 18cents per Mcf * * *, with such rate to be effective for the duration of the temporary authorization and until a different prospective rate is established.'
 
 
 [7]
 The notice of proposed change in the rates was filed on May 12, 1961, to be effective on May 19, 1961 in accordance with the terms of the amended contract. Deliveries had commenced 30 days earlier on April 19, 1961. No question has been raised about the sufficiency of that notice or its operative effect generally under 4(e)
 
 
 [8]
 The Order of May 31 including the action on July 26 is the subject of the second petition to review filed in this Court. See note 5, supra
 Thus we see how the paper mill burden may increase by operation of the mandatory rehearing prerequisite of 19(b).
 
 
 [9]
 See note 6, supra
 
 
 [10]
 The Commission's letter of November 2, 1961, continued: 'The condition in the temporary authorization preventing you from charging or collecting more than 18cents per Mcf during the term of that authorization without express and prior Commission approval is necessary to permit the Commission to carry out its duty to give careful scrutiny to producer prices in issuing permanent certificates. See, e.g., Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378 (79 S.Ct. 1246, 3 L.Ed.2d 1312). If you were to be allowed to use the procedures of Section 4(d) of the Natural Gas Act during the period of your temporary authorization, the Commission could not prevent increased rates from becoming effective even though those rates might irrevocably breach the price line or trigger price increases. * * *.'
 
 
 [11]
 There is some suggestion that this might be affected by the action of the Court of Appeals in Public Service Commission of State of New York v. F.P.C., 1961, 111 U.S.App.D.C. 153, 295 F.2d 140, cert. denied, 1961, 368 U.S. 948, 82 S.Ct. 388, 7 L.Ed.2d 343, reversing the Commission's refusal to allow the New York Public Service Commission to intervene
 
 
 [12]
 United Gas Improvement Co. v. F.P.C., 5 Cir., 1961, 290 F.2d 133, cert. denied sub nom., Sun Oil Co. v. United Gas Improvement Co., 1961, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27; United Gas Improvement Co. v. F.P.C., 9 Cir., 1960, 283 F.2d 817, cert. denied sub nom., Superior Oil Co. v. United Gas Improvement Co., 1961, 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191, and California Co. v. United Gas Improvement Co., 1961, 365 U.S. 881, 81 S.Ct. 1030, 6 L.Ed.2d 192; United Gas Improvement Co. v. F.P.C., 10 Cir., 1961, 287 F.2d 159; Public Service Commission of State of New York v. F.P.C. 1960, 109 U.S.App.D.C. 292, 287 F.2d 146 cert. denied sub nom., Hope Natural Gas Co. v. Public Service Commission of State of New York, 1961, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192, and Shell Oil Co. v. Public Service Commission of State of New York, 1961, 365 U.S. 882, 81 S.Ct. 1030, 6 L.Ed.2d 192
 
 
 [13]
 Along with shorthand references to 4 and 5 proceedings, etc., the words 'temporary' or 'temporaries' seem destined to become a part of the jargon too
 
 
 [14]
 United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373
 
 
 [15]
 In the report of the Commission, Opinion No. 338, in the Phillips case of September 1960, 24 F.P.C. 537, demonstrating the absurdity of a traditional cost of service approach, the Commission described its plight in these words. 'An illustration of the administrative impossibility of separate determinations for all producers' rates is found in the fact that there are 3,372 independent producers with rates on file with this Commisson. The producers have on file with us 11,091 rate schedules and 33,231 supplements to these schedules. Currently, 570 of these producers are involved in 3,278 producer rate increase filings now under suspension and awaiting hearings and decisions. The number of completions of independent producer rate cases per man-year during the first 6 years following the Phillips decison indicate that nearly s3 years would be required for our present staff to dispose of the 2,313 cases pending on July 1, 1960. Within this 13-year period an additional estimated 6,500 cases would have been received
 'Thus, if our present staff were immediately tripled, and if all new employees would be as competent as those we now have, we would not reach a current status in our independent producer rate work until 2043 A.D.-- eighty-two and one-half years from now. Of course, we could expect to improve our techniques and thus shorten the time required to process these cases. If we increased our efficiency one thousand percent, we would achieve current status in 1968-- eight and two-tenths years from now. * * *.' 24 F.P.C. at .
 The Commission, with whatever help it can marshal from Congress, perseveres in its determination to make some headway. Justifiably pointing to some improvement the Commission's outlook is very guarded. The Commission's first quarterly report (Release No. 11,991; G-6559) of May 1962 reflects that '* * * the Commission had made a small reduction in its backlog of independent producer gas certificate cases during the year * * *,' reducing them from 3,122 to 3,026. But in the 3,026 producer certificate cases pending as of March 31, 1962, a total of 2,096 have been granted temporaries. Headway is being made. In the first quarter of calendar year 1962, a total of 606 certificate cases were disposed of in contrast to 217 in the previous quarter and 301 in the same quarter of 1961. However, the backlog will be a long time fixture for against 606 dispositions, there were 423 new filings. At today's pace the dispositions exceed new filings on an annual basis by a net of some 720 cases. Thus it will take 4 1/2 years to eliminate the backlog of 3,026 cases.
 In independent producer rate filings and actions, there were 2,845 filings under suspension aggregating $168,654.424. Many of these are involved in the two area rate proceedings, one of which is now in progress in Docket No. AR61-1, but the Commission concludes a 'significant decrease in number of suspensions on hand is not anticipated pending conclusion of (the first area rate) hearing.'
 The Commission through its chairman is currently seeking a 31% increase in appropriations to obtain an adequate staff to eradicate this obstacle.
 
 
 [16]
 The hopes and fears of all the years-- por the natural gas business at any rate-- is protrayed by Judge Prettyman with his characteristic brillance in the opinion of the Court of Appeals sustaining the Commission's decision in the Phillips case. State of Wisconsin v. F.P.C., 16175; Long Island Lighting Co. v. F.P.C., 16177; People of the State of California v. F.P.C., 16180, D.C.Cir., 1961, 303 F.2d 380. With certiorari having been granted, 369 U.S. 870, 82 S.Ct. 1138, 1139, 8 L.Ed.2d i75, the decision of the Supreme Court will be portentous
 
 
 [17]
 In seeking the increased appropriations (note 15, supra), the chairman is reported as testifying that the present Permiam Basin area rate proceeding would not be settled for a year or two. Moreover, until it and the South Louisiana proceeding are well along, the Commission would not likely initiate any others
 
 
 [18]
 Any specialized treatment of pending certification applications likewise tends to imperil either the utility, or the broad legality, of the area pricing system envisaged in 61-1. By its terms the rates specified in the appendix 'ard for the purpose of guidance and initial action by the Commission' for use by it 'in the absence of compelling evidence calling for other action' in passing upon 'proposed initial sales' and '* * * rate changes filed under existing contracts which call for a rate exceeding the indicated price level * * *.'
 
 
 [19]
 As to this we are not here dealing with academic theoretical. For the Producer, pursuing essentially what the Commission has done with regard to the postrecord letter of November 2, 1961, has brought to our attention a current temporary (Docket No. C162-216 of October 6, 1961) in which to a condition (2) fixing the rates to 'remain in effect until changed by Commission order' the Commission attaches another condition that the producer not seek any rehearing or review:
 '(3) The temporary authorization with conditions attached shall be accepted as issued and without reservations for further review after commencement of service, within 30 days herefrom by written acceptance * * *. If reconsideration of such temporary authorization is sought, service hereunder shall not be started. If service is commenced under this authorization, the conditions attached shall be effective and the service may not be discontinued without permission of the Commission * * *.'
 
 
 [20]
 So long as F.P.C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499, stands 1(b) denies power to do this
 
 
 [21]
 We do not undertake to blueprint the matters requiring reconsideration. But it is quite clear that as condition (1) as amended (notes 6, 8, 10) was illegal and void, the filing of the amended contract and the proposed rate increase were legal. The rate represented by the proposed increase became effective on its filing subject to a maximum of five months' suspension. But since it is a certainty that the Commission would have exercised the right of suspension, the collection thereafter must be deemed to have been under an order for refund