CALIFORNIA OIL COMPANY, WEST-
ERN DIVISION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 7148.

United States Court of Appeals
Tenth Circuit.

March 28, 1963.

Justin R. Wolf, Washington, D. C. (V. P. Cline, Denver, Colo., Eugene E. Threadgill and Stanley Wanger, Washington, D. C., on the brief), for petitioner.

Paul A. Sweeney, Sp. Consultant (Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., and Robert L. Russell, Asst. Gen. Counsel, on the brief), for respondent.

J. Calvin Simpson, Sr. Counsel, San Francisco, Cal. (William M. Bennett, Chief Counsel and Walter G. Linstedt, Asst. Counsel, San Francisco, Cal., on the brief), for intervenors, People of State of California and Public Utilities Commission of State of California.

J. David Mann, Jr., Washington, D. C. (Harry P. Letton, Jr., Milford Springer, Los Angeles, Cal., William W. Ross, Washington, D. C., and William E. Zeiter, Philadelphia, Pa., on the brief), for intervenors, Southern California Gas Co. and Southern Counties Gas Co. of California.

Before BRATTON, LEWIS and HILL, Circuit Judges.

HILL, Circuit Judge.

This is a petition to review an order of the Federal Power Commission brought by California Oil Company, Western Division, (petitioner) under the provisions of Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). The opinion and order complained of, entered on June 11, 1962, granted to the petitioner a permanent certificate of public convenience and necessity providing for the sale by it to El Paso Natural Gas Company (El Paso) of natural gas in interstate commerce for resale. However, the Commission, as a condition to the issuance of the certificate and

pursuant to its authority under Section 7(e) of the Act, 15 U.S.C. § 717f(e), prescribed an initial sale price of 15.384 cents per Mcf at a pressure base of 15.025 psia in substitution of the contract price of 18.5 cents per Mcf.

The question is whether under the facts set forth in the record the Commission could validly and legally prescribe an initial sales price of the gas at 15.384 cents per Mcf rather than the 18.5 cents per Mcf called for by the contract, as a condition to the issuance of the certificate. Petitioner contends that the condition is not a reasonable one within the meaning of Section 7(e) of the Act; that the Commission acted arbitrarily and capriciously in imposing it; and that the Commission's action in this respect is discriminatory and deprives it of property without due process of law. The Commission, on the other hand, takes the position that it was merely performing its duty of holding the line on the price of natural gas in interstate commerce by fixing the initial price so as to protect the ultimate consumer as it was admonished to do by the Supreme Court in Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, commonly referred to as the CATCO case.

The certificate in question authorizes the sale of natural gas produced by petitioner from the Red Wash Field, which is a part of the Red Wash Unit located in the Uintah Basin of Northeastern Utah. The land comprising the Red Wash Unit is owned, in part, by the United States and, in part, by the State of Utah. It is leased to petitioner, an independent producer of natural gas. The Red Wash Field is a unitized operation in which petitioner acts as the operator and owns the majority interest of 97.64 per cent. The ownership of the remainder of the field is not material here.

The discovery oil well in the Red Wash Field was drilled by petitioner in 1951 and, since that time, the field has been developed to include 123 producing oil wells, 7 gas injection wells, 2 dry holes and 6 gas wells capable of producing gas. These 6 wells have been, and presently are, shut-in and have never been connected with the gathering system which petitioner has built since 1957. The oil wells produce both oil and casinghead gas but, prior to 1960, the field was operated exclusively for the production of oil. The casinghead gas produced from the oil wells was, until 1960, collected in petitioner's gathering system and taken to its central processing plant where the gas was compressed and, thereafter, reinjected to aid in the production of oil.

In January, 1960, the gas sales contract involved herein was entered into by petitioner and El Paso. Under the terms of that contract, petitioner agreed to sell and El Paso agreed to buy certain minimum quantities of the casinghead gas previously reinjected to aid in the production of oil at an initial price of 18.5 cents per Mcf at a pressure base of 15.025 psia. The contract provides for an escalation of 1 cent every 5 years over the 20 year life of the contract. It also provides for delivery of the gas at the tailgate of petitioner's processing plant. After such delivery to El Paso, the Red Wash gas moves into El Paso's main line without any additional processing or compression being required. Thus, this is not a wellhead sale, but, rather, it is a gas plant sale.

In March, 1960, petitioner filed its application for a certificate of public convenience and necessity under Section 7 of the Act seeking authorization for the sale, under the above contract, of the gas to El Paso for resale. In April, 1960, petitioner's application for temporary authorization to make the sale to El Paso was granted by the Commission and delivery of the gas commenced in June, 1960. However, the temporary certificate was issued subject to the condition that the initial sales price be reduced from the contract price of 18.5 cents per Mcf to 15 cents per Mcf. It was further provided that the condition imposed was "without prejudice to such final disposition of the application for certificates as the record may require."

A hearing was held before an examiner on petitioner's application for the permanent certificate. At the hearing, certain interested parties appeared as intervenors as they do here and, in general, they urged that an initial sales price of from 12 to 15 cents should be established. The Commission Staff presented evidence as to the price for gas sold in Utah and contended for a 12 cent price. Petitioner presented evidence as to the high cost of exploratory drilling in Utah and the need for an incentive price to encourage such drilling. It was established that Utah is one of the most expensive areas in the United States in which to drill. Petitioner also presented evidence with respect to prices paid and delivery conditions under other gas sales contracts in Utah, Colorado and Wyoming in an effort to distinguish some of such sales and establish its position that 18.5 cents was required by the public convenience and necessity. In addition, the examiner had before him the area prices fixed by the Commission in its Statement of General Policy No. 61–1, 24 F.P.C. 818, showing the "in line" price for gas in Colorado at 15 cents per Mcf at 15.025 psia and in Wyoming at 15.384 cents per Mcf. No price was fixed for the sale of gas in Utah by this policy statement.

The examiner concluded that Northeastern Utah, Southwestern Wyoming and Northwestern Colorado constituted a pricing area.[1] He recommended that a permanent certificate be issued with a conditioned price of 15 cents per Mcf at 15.025 psia. Exceptions to this decision were filed by the Staff and by petitioner. The Commission, after carefully reviewing the record, issued a detailed opinion wherein it concluded that the sales prices from Southwestern Wyoming could appropriately be applied to the sale of Red Wash gas. In accordance therewith, the certificate was issued conditioned upon the initial sales price not exceeding 15.384 cents per Mcf. Petitioner's application for rehearing was denied and it filed this petition to review.

■ At the outset, we must recognize and emphasize that this case involves the issuance of a certificate of public convenience and necessity under Section 7(e) of the Act. It is not a "rate" case under either Section 4 or Section 5 and, therefore, the complex and intricate problems as to what is a "just and reasonable" price under those sections are not before us. We have only to determine the issue of the validity of the price condition imposed upon the certificate issued to petitioner.

■ It is well settled that in appropriate circumstances the Commission can, and indeed should, attach initial price conditions to the grant of a permanent certificate of public convenience and necessity. Atlantic Refining Co. v. Public Service Commission, supra; Texaco, Inc. v. Federal Power Commission, 5 Cir., 290 F.2d 149; Signal Oil and Gas Co. v. Federal Power Commission, 3 Cir., 238 F.2d 771, cert. denied, 353 U.S. 923, 77 S.Ct. 681, 1 L.Ed.2d 720; Public Service Commission of New York v. Federal Power Commission, 109 U.S.App.D.C. 292, 287 F.2d 146, cert. denied, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192. The same rule is applicable with respect to a price adjustment clause and other contract provisions in the issuance of a temporary certificate. Sohio Petroleum Company v. Federal Power Commission, 10 Cir., 298 F.2d 465; Sunray Mid-Continent Oil Co. v. Federal Power Commission, 10 Cir., 270 F.2d 404; Hunt v. Federal Power Commission, 5 Cir., 306 F.2d 334; American Liberty Oil Co. v. Federal Power Commission, 5 Cir., 301 F.2d 15; J. M. Huber Corporation v. Federal Power Commission, 3 Cir., 294 F.2d 568.

■ The Commission's authority and power to attach conditions to the issuance of a certificate is found in Section

---

1. On June 11, 1962, in Docket No. R–218 (27 Fed.Reg. 5714) the Commission under its rule-making authority proposed that Northeastern Utah, Southwestern Wyoming and Northwestern Colorado be combined into a single pricing area.

7(e), 15 U.S.C. § 717f(e), which provides, in pertinent part, as follows:

"* * * The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

And, it is in accordance with the purpose of the Natural Gas Act to "underwrite just and reasonable rates to the consumers of natural gas" and "As the original § 7(c) provided, it was 'the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.' 52 Stat. 825. The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." Atlantic Refining Co. v. Public Service Commission, supra, 360 U.S. at page 388, 79 S.Ct. at page 1253.

■ But, the exercise by the Commission of its power to attach conditions to a permanent certificate for the sale of gas must be supported by soundly based findings in the record before it. Pure Oil Company v. Federal Power Commission, 7 Cir., 292 F.2d 350. Or, as stated by Judge Lewis speaking for this Court in Sohio Petroleum Company v. Federal Power Commission, supra, 298 F.2d at page 466, the Commission has the power to condition temporary certificates "subject only to the limitations of due process and the general jurisdiction accorded the Commission by the provisions of the Act."

In the CATCO case, the Supreme Court in recognizing the right and duty of the Commission to give consideration to the reasonableness of a proposed price in a Section 7 proceeding for a permanent certificate stated:

"* * * Where the proposed price is not in keeping with the pub-

lic interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary.

"This is not an encroachment upon the initial rate-making privileges allowed natural gas companies under the Act, United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra [350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373], but merely the exercise of that duty imposed on the Commission to protect the public interest in determining whether the issuance of the certificate is required by the public convenience and necessity, which is the Act's standard in § 7 applications. In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate. Thus the purpose of the Congress 'to create a comprehensive and effective regulatory scheme,' Panhandle Eastern Pipe Line Co. v. Public Service Comm'n of Indiana, 332 U.S. 507, 520 (1947), [68 S.Ct. 190, 197, 92 L.Ed. 128], is given full recognition. And § 7 is given only that scope necessary for 'a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission * * *.' United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra, [350 U.S.] at 341. [76 S.Ct. at page

379]. On the other hand, if unconditional certificates are issued where the rate is not clearly shown to be required by the public convenience and necessity, relief is limited to § 5 proceedings, and, as we have indicated, full protection of the public interest is not afforded." (360 U.S. at pages 391–392, 79 S.Ct. at page 1255)

The guide lines or standards to be used in ascertaining the "in line" price were set forth in United Gas Improvement Co. v. Federal Power Commission, 9 Cir., 283 F.2d 817, 823, cert. denied, 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191, as follows:

" * * * the 'line' referred to in Catco may properly be referenced to relevant existing producer prices under which substantial amounts of natural gas move in interstate commerce. Where some or all of the relevant producer prices are those paid by other pipeline companies it is especially important that they be consulted for comparative purposes. * * * Where there are no relevant existing producer prices with which a price proposal may be compared, Catco indicates the best criterion of a proper price line may be the applicant's prices elsewhere, qualified where necessary by substantial evidence explaining price differentials.

"Existing producer prices are relevant for comparative purposes only if they pertain to gas production in the same or an analogous area and if other principal features of the contracts are fairly comparable. Thus the contracts should be comparable from the standpoint of gas reserves and future potentials. The significance of any disparities existing as to these conditions should be explained by Commission findings based upon substantial evidence. Substantial variation in the quality of gas sold should be similarly treated. * * * Disparate provisions relative to facilities to be provided and other services to be rendered should be given effect as well in determining the propriety of the analogy to rates under other existing contracts.

"In our view, however, a determination of relevancy for comparative purposes does not require examination into factors such as relative production costs which are not reflected in specific terms of the contracts. If this were required to implement the 'hold the line' technique, the procedure would assume much of the complexity of a rate adjudication. This would tend to defeat the objective of providing simple, direct and effective stopgap protection for the consuming public. Where there are no producer prices which are otherwise comparable and resort must be had to other criteria, however, relative production costs, need, competition between pipeline companies, and no doubt other factors become significant."

When an application for a certificate is filed, in which the proposed initial contract price is "out of line" within the meaning of CATCO, the Commission has the power to either decline to issue the certificate at all or grant a conditional certificate requiring new schedules providing for a lower rate in lieu of the initial contract rate. The Commission's power to condition a certificate is co-extensive with its power to reject or deny a certificate, even though this might make it impossible for the producer ever to get its initial price. Texaco, Inc. v. Federal Power Commission, supra. Here, the Commission issued a conditional certificate requiring a lower initial sale price. Therefore, our review of the order in question is confined to a determination, from the record, of whether the prescribing of such condition is supported by soundly based findings, or, stated in another way, whether it is supported by substantial evidence when measured by the foregoing standards.

In support of its contention that the condition is unreasonable, petitioner argues: The evidence establishes that the costs of exploration, drilling and development in the Uintah Basin area are unusually high and in excess of similar costs in the Wyoming area; because of these higher costs, the Wyoming price for gas cannot properly be applied to the sale of Red Wash gas in Utah and there should be included in the initial price an additional amount as an incentive to encourage exploration for gas in the Uintah Basin Area; the Commission policy in the past has been to give consideration to such costs and, in Phillips Petroleum Company, 22 F.P.C. 528, a higher initial price based upon such considerations was allowed. It says that this principle was explicitly affirmed by the Commission in its Statement of General Policy No. 61–1 and should be followed here, thus, allowing the proposed contract rate of 18.5 cents.

In this connection, the Commission found the Wyoming gas was "produced in a region which, with respect to geology, geography, and the conditions of exploration, production and marketing, is quite similar to the Uintah Basin of northeastern Utah." It concluded that "this price line for sales in the neighboring Wyoming area may appropriately be applied to the proposed Red Wash sales in the Uintah Basin."

From our examination of the record, we think these findings are supported by the evidence and the Commission's conclusion must stand. All of the expert witnesses, including those who appeared on petitioner's behalf, testified that the Uintah Basin and the Southwestern Wyoming area were similar in geologic, stratigraphic and topographic conditions, although one of petitioner's witnesses did testify that the Wyoming area would be an easier area in which to operate. The Southwestern Wyoming area is, of course, in close proximity to the Uintah Basin and the gas from both areas goes to the same market, i. e., the Pacific Northwest. There is little, or no, evidence in the record to show that the public convenience and necessity requires an initial sales price of 18.5 cents as called for by the contract. It is true petitioner's expert witnesses testified that an average price of 20 cents is required to furnish the incentive for future development. However, one of such witnesses also testified that "if the price is 12 cents, there still would be exploration in there." In addition, there is nothing in the record to show that the Pacific Northwestern marketing area is vitally in need of additional gas or in need of it at all. Thus, it can hardly be concluded that public convenience and necessity requires the gas at the contract price of 18.5 cents.

Petitioner's remaining contention is that the Commission's action in prescribing a lower initial sales price than the price called for by the contract, as a condition to the issuance of the certificate, is arbitrary, capricious and discriminatory because no allowance over and above the area wellhead price was made for its services in gathering, processing, dehydrating and compressing the gas for delivery to El Paso. It points out that the Southwestern Wyoming area price is for the sale of wellhead gas whereas the sale here is for gas plant gas and, thus, petitioner has performed the above mentioned services after the gas leaves the wellhead and before it is delivered to El Paso at the tailgate of its processing plant. Petitioner also points out that the Commission did make an allowance for such services in Panhandle Eastern Pipeline Co., 27 F.P.C. 35, and argues that there is no reason for not doing so here. It further argues that, in any event, the Commission has established prices of 17.7 cents and 17.5 cents per Mcf for the sale of gas from areas within the State of Utah in the cases of El Paso Natural Gas Company, 23 F.P.C. 369, aff'd, Texaco, Inc. v. Federal Power Commission, 5 Cir., 290 F.2d 149, and Oil, Inc., 25 F.P.C. 1178, and that, by not allowing a comparable price here, the Commission has arbitrarily discriminated against the sale of Red Wash gas.

It is true that the 15.384 cent price established for the Wyoming gas is for a sale at the Wellhead and this case involves a gas plant sale after the delivery services have been performed. It is also true that the Commission made an allowance for such services in the Panhandle Eastern Pipeline Co. case, supra. But this is not decisive or controlling here. We agree with the Commission that the two cases are distinguishable. The Panhandle gas is gas-well gas as distinct from casing-head gas and therefore it is considered to be pipeline quality gas at the wellhead. That is not true of the Red Wash gas which must be processed before it becomes pipeline quality gas and petitioner would be required to maintain a processing plant whether the gas is sold or reinjected to aid in the recovery of oil. The gas from these two areas is supplied to different marketing areas.

■ Moreover, the Commission's refusal to apply the Panhandle principle to this case is in keeping with the spirit of its Statement of General Policy No. 61–1, the validity of which is not questioned here. In that statement, the Commission on its own motion and "based on our experience gained after six years of regulation of independent producers", determined that initial rates should be established on an area basis. (24 F.P.C. at page 818). While no prices were fixed for Utah area gas in that statement, certainly its spirit, if not its letter, would be violated by applying principles for the sale of gas in Oklahoma to the sale of gas in Utah. As stated by the Court in United Gas Improvement Co. v. Federal Power Commission, supra, 283 F.2d at page 823, "Existing producer prices are relevant for comparative purposes only if they pertain to gas production in the same or an analogous area * * *." We think this rule should also be applicable to other considerations, such as an allowance for delivery costs.

■ Petitioner's reliance upon El Paso Natural Gas Company, supra, is also misplaced. The gas there was produced from the Aneth Field which is located in the Paradox Basin of South-eastern Utah. One of petitioner's own witnesses testified that "The Paradox Basin is in an entirely different geological province than the rest of Utah" and stated that he had "confined my analysis to Utah excluding the Paradox Basin. * * *" Thus, the Aneth sale is unrelated to the Red Wash sale and as the Commission said, "cannot be found to be part of the same pricing area as the Uintah Basin." Therefore, the "in line" price for the sale of Red Wash gas cannot be predicated upon the Aneth price. Nor can the 17.5 cent price authorized in Oil, Inc., 25 F.P.C. 1178, be used to determine the "in line" price applicable here. We agree with the Commission that the sales in that case "do not represent sufficient quantities of gas, or enough contracts, to constitute an established and stable market for gas in the Uintah Basin" and "It is necessary, therefore, to look beyond the boundaries of Utah to sales in the adjoining states of Colorado and Wyoming to find comparable sales which may be used as a basis for determining a price line applicable to the Red Wash sales."

We conclude the evidence in the record before the Commission is sufficient to support its determination in this Section 7 proceeding that an initial price of 18.5 cents would not be in keeping with the public convenience and necessity but that an initial price of 15.384 cents would be. As the court observed in Texaco, Inc., v. Federal Power Commission, supra, 290 F.2d at page 157:

"* * * The power and duty of the Commission to give 'most careful scrutiny and reasonable reaction to initial price proposals of producers' may be discharged by it without the elaborate and detailed proofs required in a section 4 or section 5 proceeding. * * *"

■ Beyond this, however, we also have serious doubts as to whether any of the costs or delivery services urged by petitioner to sustain the initial price of 18.5 cents are relevant at all in determining the "in line" price in a Section 7 proceeding. The CATCO case, supra,

directs the Commission to "hold the line" on price while the "just and reasonable" price is being determined in an appropriate proceeding. The Court, in United Gas Improvement Co. v. Federal Power Commission, supra, said that "The 'hold the line' technique spelled out in Catco is a stopgap device"; that the "in line" price should be determined by comparing the proposed price with existing producer prices in the area; and that "comparative purposes does not require examination into factors such as relative production costs which are not reflected in specific terms of the contracts." (283 F.2d at pages 822 and 823). We do not think that the Commission was required in this case to consider the exploration and drilling costs or the cost of delivery services in arriving at the "in line" price in a certification proceeding. The consideration of these matters may properly be left to a Section 4 proceeding.

Furthermore, in CATCO, the Court said that producers' price "proposals must be supported by evidence showing their necessity to 'the present or future public convenience and necessity' before permanent certificates are issued." (360 U.S. at page 391, 79 S.Ct. at page 1255). It is abundantly clear from this language that the producer has the burden of proving that his proposed price is at or under the line. The record before us does not show that petitioner met that burden. We do not say that petitioner has the burden in this proceeding of establishing that its proposed price is "just and reasonable" within the meaning of Section 4. We do say that it had the burden of proving that its proposed price meets the requirements of the "in line" price prevailing in the area. And, we think it is appropriate here to say that there is nothing to prevent petitioner from immediately filing a proposed rate increase to 18.5 cents after complying with the condition requiring it to file a new schedule carrying an initial price of 15.384 cents per Mcf, which it apparently has done. Or, as the Commission suggests in its brief, petitioner may properly present its case for a higher sale price in the pending area price hearing in Docket No. R–218. In this manner, the price line on gas in the Uintah Basin will be held until a "just and reasonable" price is determined.

The order is affirmed.