335 F.2d 1004
 55 P.U.R.3d 274
 CALLERY PROPERTIES, INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
The SUPERIOR OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
Caroline Hunt SANDS and Loyd B. Sands, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
PLACID OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
Margaret Hunt HILL, Trustee for Hassie Hunt Trust, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
J. RAY MCDERMOTT & CO., INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
OCEAN DRILLING & EXPLORATION COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
J. R. FRANKEL et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 20872, 20885, 20890-20892, 20967, 20989, and 21028.
 United States Court of Appeals Fifth Circuit.
 Aug. 14, 1964, Rehearings Denied Sept. 22, 1964.
 
 Richard F. Generally, Gene Perry Bond, May Shannon and Morley, Washington, D.C., for Callery Properties, Inc.
 H. W. Varner and Roland B. Voight, Houston, Tex., for the Superior Oil Co., Murray Christian, Houston, Tex., of counsel.
 Thomas G. Crouch, Robert W. Henderson, Dallas, Tex., for Caroline H. Sands and others and Margaret H. Hill, etc.
 Paul W. Hicks, shreveport, La., for Placid Oil Co.
 William G. Love, Houston, Tex., for J. Ray McDermott & Co.
 H. H. Hillyer, Jr., New Orleans, La., for I. R. Frankel and others.
 J. Evans Attwell, Houston, Tex., for Ocean Drilling & Exploration Co.
 Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel, William I. Harkaway and Josephine H. Klein, Attys., and Robert L. Russell, Asst. Gen. Counsel, F.P.C., Washington, D.C., for respondent.
 
 
 1
 William T. Coleman, Jr., Philadelphia, Pa., for United Gas Improvement Co.
 
 
 2
 Vernon W. Woods, Shreveport, La., for United Gas Pipe Line Co.
 
 
 3
 Morton L. Simons, Washington, D.C., for Long Island Lighting Co., Philadelphia Electric Co., United Gas Improvement Co., and Public Service Commission of New York State.
 
 
 4
 Kent H. Brown, Albany, N.Y., for Public Service Comm. of N.Y.
 
 
 5
 Samuel G. Miller, Donald Blanken, Philadelphia, Pa., for Philadelphia Electric Co.
 
 
 6
 Thomas F. Ryan, Jr., Washington, D.C., for Transcontinental Gas Pipe Line Co.
 
 
 7
 Robert W. Maris, Philadelphia, Pa., for United Gas Improvement Co.
 
 
 8
 David K. Kadane, Bertram D. Moll, Mineola, N.Y., for Long Island Lighting Co.
 
 
 9
 Edward M. Barrett, Mineola, N.Y., for Long Island Lighting Co.
 
 
 10
 Henry P. Sullivan, Philadelphia, Pa., for Philadelphia Electric Co.
 
 
 11
 Aaron M. Fine, Philadelphia, Pa., for United Gas Improvement Co.
 
 
 12
 Before RIVES and BROWN, Circuit Judges, and GROOMS, District Judge.
 
 
 13
 JOHN R. BROWN, Circuit Judge.
 
 
 14
 These cases present important questions under the Natural Gas Act, 15 U.S.C.A. 717. These include the nature of the hearing and the scope of the pertinent evidence bearing on price in a 7 application for permanent certificate, the legality of retroactive rate refund, and the validity of a moratorium on post-certificate 4 price increases.
 
 
 15
 The cases are not new for us, certainly not, as to one case. Their presence here bears out the prediction of the dissenter[1] that 'this case will be back several years and thousands of pages later.'[2] Without assaying the balance of the dissenter's prophesy that 'no one will know more than is known now,' it is ironic that we hold that we do not know enough because the Commission declined to receive and evaluate important evidence. Thus, in their fifth year, these applications must now go back to have the kind of hearing which we, and other Courts of Appeals, directed.
 
 I.
 
 16
 These are all fallout from Catco[3] in which the Supreme Court reversed the unconditioned certificate because the 21.4cents price was 'out of line.'
 
 
 17
 Within a short time after affirmance by the Third Circuit on August 4, 1959, of the Transco-Seaboard case,[4] the FPC in 6 separate formal hearings involving a total of 69 producer applications issued unconditioned certificates for South Louisiana (and offshore) sales at initial contract prices ranging from 21.4cents per Mcf where no tax reimbursement was due to 23.8cents including tax reimbursement. But within 4 months, the Third Circuit's Transco-Seaboard decision was summarily reversed.[5] On appeals taken by various distributor-intervenors, the grant of the certificates was reversed by this Court and Courts of Appeals for the Third, Ninth, Tenth, and D.C. Circuits.[6]
 
 
 18
 On May 10, 1961, the FPC consolidated the remanded proceedings with the Southern Louisiana area rate proceeding.[7] On January 10, 1963, the FPC denied motions of some intervenor-distributors for security on possible rate refunds. Expressing the view that it has 'power to redetermine these proceedings on the basis of the respective records as originally made and in the light of additional facts of which we may take official notice' without further hearing, the Commission nevertheless determined to 'adhere to the view that it would be fair and wiser in the present circumstances to offer the applicants a further opportunity to adduce evidence in docket numbers AR61-2 et al. In support of their proposed prices.' But it ordered that rate collections 'shall be subject to such refund provisions as the Commission may lawfully prescribe by its final order * * * to the extent, if any, that the rate which has been collected exceeds the rate ultimately found to accord with the requirements of the public convenience and necessity.'[8] In overruling the petitions for rehearing, the FPC on March 7, 1962, severed the proceedings from AR61-2 and then 'consolidated (them) for the limited purpose of determining the public interest, initial price, or prices, applicable to these proceedings.'[9] In this order of March 7, 1962, the FPC noted that six weeks earlier, in the remanded Catco dockets, it had found the in-line level in South Louisiana to be 18.5cents per Mcf, plus 1.5cents tax reimbursement where applicable. Rejecting contentions by intervenor-distributors that a like finding should peremptorily be entered in these proceedings, the Commission nonetheless concluded that it 'should afford the producers further opportunity to be heard.'
 
 
 19
 The hearings thus scheduled were held before an Examiner June 18-21, 1962. At the outset of the hearing, the producers sought to introduce what the Examiner described as 'a tremendous mass of cost-type, economic and financial evidence.' This cost-of-service evidence followed generally the pattern used by the Commission in prior determinations. Broadly speaking it demonstrated that on a cost-of-service basis the cost to the producers was considerably in excess of the contract price sought to be certificated in the pending applications. Other evidence bore upon the minimum financial requirements for finding and producing gas. These also used techniques and methods employed by the Commission in determining analogous minimum financial requirements. Other evidence showed the demand and supply situation existing both nationwide and in South Louisiana. Some was detailed, indicating that the demand for gas is increasing far in excess of the annual additions of gas supply. Other evidence tied this directly into the exploration for, and finding of, new gas supplies to meet the increased demands, the relation of field prices to those efforts, the impact of lowered prices on exploratory activity, and the like. Other evidence showed the nationwide increase in the current cost of new gas supply over the pre-Catco prices, the increase in the weighted average contract price in this period in relation to drilling and exploratory costs, and refutation of the assertion that contract prices in South Louisiana have leaped from plateau to plateau. We need not describe it in any greater detail since in affirming the Examiner's rejection of the evidence, the Commission characterized it as 'economic and financial evidence' including that relating to 'an individual company or on an area-wide basis' without regard to whether it was 'the type characterized as cost-of-service studies, cash flow studies, demand-supply, cost, profit and market price trends, area cost-revenue trends, comparative well cost data and gas replacement costs * * *.'
 
 
 20
 On the motion of the intervenor-distributor supported by Commission staff, the Examiner rejected all of this evidence. In his decision of December 7, 1962, he (1) concluded that the in-line price for the pending sales was 18.5cents per Mcf plus 1.5cents per Mcf tax reimbursement where applicable, (2) directed that the producers refund with interest, all amounts previously collected in excess of the in-line levels of 18.5cents and 20.0cents.[10] Accepting in the main all of the Examiner's findings and conclusions, the FPC by opinion 398, issued July 17, 1963, took these actions. It unanimously sustained the exclusion of producer cost data, and the finding that the in-line price was 18.5cents. By a 4-1 vote it approved the refunds.[11] In addition, the Commission-- on the basis of a finding that rate filings to levels in excess of 23.55cents per Mcf would cause widespread triggering throughout Southern Louisiana-- imposed a moratorium on filings in excess of 23.55cents until July 1, 1967, or until the conclusion of the pending Southern Louisiana AR61-2 proceeding, whichever is earlier.[12]
 
 
 21
 Petitions for review have been filed by the producers (see note 6, supra). The questions presented for our decision are these. (1) Did the Commission err in excluding the proffered cost and economic data evidence? (2) Did the Commission err in imposing a moratorium on price increases in a permanent certificate? (3) Did the Commission err in ordering refunds of the amounts previously collected? (4) Did the Commission err in fixing the in-line price at the 18.5cents level? (5) Did the Commission err as to take-or-pay refund provisions? (6) Did the Commission err in making the refund order applicable to Frankel and Placid's Docket No. 13184?
 
 II.
 Exclusion of Cost Evidence
 
 22
 We think that a proper consideration of the Act and its elucidation in Catco demonstrates that the Commission erred in rejecting the proffered evidence on cost and other economic data. No doubt Catco is significant and binding, and we accept it without any effort to whittle it down. But the simple fact remains that it is a statute which we are expounding, and the statute does not refer to, much less speak of 'in-line' price. To be sure, whether a proposed price is in-line or not is an important, sometime decisive, factor. But it is a factor to be weighed along with others in determining whether the proposed sale of gas in interstate commerce 'is or will be required by the present or future public convenience and necessity.'[13]
 
 
 23
 In the Commission Catco proceeding the Commission, presumably reasoning that a post-certification 5 rate hearing would afford ample protection against improvident prices, declined altogether to consider the reasonableness of the proposed price or its relation to public convenience and necessity. This approach seemed to find some basis in the structure of the Act in which the statutory provisions concerning rates were found in 4[14] and 5[15] and not in 7 which dealt with the initial application for certification, temporary or permanent. This argument acquired some operational support from the magnitude of the administrative problems, both in time and manageability, of turning every 7 application into a full blown rate hearing to determine whether the proposed rate was 'just and reasonable.'
 
 
 24
 The Supreme Court in Catco forcibly rejected this approach of the Commission. The Court made clear that price was indeed important. It recognized, of course, that 'the Act does not require a determination of just and reasonable rates in a 7 proceeding * * *' or 'that a 'just and reasonable' rate hearing is a prerequisite to the issuance of producer certificates.' And the Court pointed out that it was the delay in processing 5 proceedings that 'requires a most careful scrutiny and responsible reaction to initial price proposals of producers under 7.' But the Court immediately tied price to public convenience and necessity by requiring that the price 'proposal must be supported by evidence showing their necessity to 'the present or future public convenience and necessity' before permanent certificates are issued.' The recent increase in the price levels the Court went on, 'does make price a consideration of prime importance' and 'where the application on * * * presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued.' After stressing 'public convenience and necessity' not less than six times in the space of two paragraphs, 360 U.S. 378, at 390-391, 79 S.Ct. 1246, at 1254-1255, the Supreme Court for the first time articulates the 'in-line' concept. 'Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary.' 360 U.S. 378, at 391, 79 S.Ct. 1246, at 1255.
 
 
 25
 The Court stressed that by certificate conditions under 7, 'the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate.' 360 U.S. 378, at 392, 79 S.Ct. 1246, at 1255. Of unusual importance here was the Court's statement in the analysis of the deficiencies of that record in which 'no effort was made to give the 'reason why' * * * the proposed price was some 70% Higher than the weighted average cost of 'existing gas to the purchaser."
 
 
 26
 As though Catco began and ended with 'in-line' the Commission and the intervenor-distributors are mesmerized by this catch phrase into supposing that the Commission's responsibility is discharged with that limited inquiry and if unsatisfied on that score, it is free to reject out of hand a producer's application for a new service. Catco did not so hold, and this approach ignores the plain terms of the statute which are no way diminished by Catco. Vast as is the discretion of the Commission, the statute, 7(e), footnote 13, supra, accords positive rights to natural gas producers desiring to sell gas in interstate commerce. A producer does not, of course, have an absolute right to engage in the sale. It does, however, subject to compliance with reasonable procedural rules and requirements of the Commission[16] have an absolute right to a consideration of the application by the Commission and the right to have it granted 'if it is found that the applicant is able and willing properly to do the acts and to perform the service * * * and the * * * sale * * * is or will be required by the * * * public convenience and necessity.' The Commission does not, therefore, fulfill its statutory duty by the limited inquiry into whether the price is 'in-line.' Conversely, it has no power to deny the application solely on the ground that the price is not 'in-line.' To be sure, if the proposed price is not 'in-line,' this may become the dominant factor in denying the application. But it must be done as a part of the larger element of 'public convenience and necessity.' The Court makes this clear in FPC v. Transcontinental Gas Pipe Line Corp., 1960, 365 U.S. 1, 8, 17, 22, 81 S.Ct. 435, 439, 444, 5 L.Ed.2d 377: 'In fact in interpreting this very section we said that '7(e) requires the Commission to evaluate all factors bearing on the public interest' * * *.' Later, the Court states, 'In this connection, it must be realized that the Commission's powers under 7 are, by definition limited. * * * The Commission cannot order a natural gas company to sell gas to users that it favors; it can only exercise a veto power over proposed transportation and it can only do this when a balance of all the circumstances weighs against certification.'[17]
 
 
 27
 In the concept of public convenience and necessity, price is, of course, very important. But it is not the whole thing. And certainly under a statutory scheme for a utility-type of regulation for the sale, not of a service, but of a depletable commodity,[18] where the Commission serves primarily as a rate-reviewing, not a rate-fixing agency,[19] and in which the entry into the regulated market is the voluntary act of the gas producer,[20] it is perfectly evident that many factors other than price alone bear upon public convenience and necessity and, in turn, upon price.
 
 
 28
 One of the most critical factors is, of course, the extent and nature of the demand. We decline to believe that the FPC can be oblivious to what all others know firsthand of occurrences since 1956-57, the era that begat the so-called Catco 'in-line' price. Population is increasing at explosive rates particularly in metropolitan areas in the South, Southwest and West Coast. What are, for example, the insatiable energy requirements of this ever-expanding population and industrial complex? If the demand is present, the next decisive question is, what about the supply? Can it reasonably be met by the gas now under dedication? Where and from what sources can the demand reasonably be satisfied? And whether this does, or does not, bring about price increases, the decisive question then becomes what price will it take to get the needed gas? The latter question, of course, sets in train a whole series of subsidiary inquiries. This is so because even under a system of voluntary initial dedication of gas, the acceptable price may not be measured by the intransigent demand of a producer. Inherent reasonableness in terms, say, of the likelihood that the needed supply of gas will be obtainable from others by exploration and new production and other similar questions would remain. Other factors could be named.[21] The important thing is that price is not the sole criteria.
 
 
 29
 A price-only approach does more than substitute for the statutory standard of 'public convenience and necessity' a rigid, mechanical arithmetical guide. It is conceivable that such a test could imperil the public interest by foreclosing needed gas from the interstate market solely because the price is out of line. The so-called 'in-line' concept necessarily involves a question of time-- here in the neighborhood of 1956-57 prior to the contaminating influence of the initial Catco contract. It involves also a selection of so-called comparables and a rejection of those which are either 'too high,' or are thought to be so, or are otherwise 'suspect.'[22] Essential as it is that the Commission scrutinize carefully apparent price increases, it is inconceivable that Congress meant to freeze the rates to 1956-1958,[23] or to any other particular time for that matter.[24]
 
 
 30
 Rather, the public interest is protected by requiring the Commission to consider price in terms of the whole public convenience and necessity. Indeed, this was recognized by the Ninth Circuit in one of the very cases precipitating the remands now under review.[25] That Court rejected as being 'without merit' the 'contention that the price line must necessarily accord with the pre-Catco line.' The Court went on, 'we agree with the view expressed by the Commission in Texas Gas Transmission Corporation et al., 22 F.P.C. 378, 388, that factors such as increased production costs since Catco, comparative accessibility of field locations, and comparative depth of sands tend to make pre-Catco prices irrelevant for comparative purposes in other cases.' United Gas Improvement Co. v. FPC, 9 Cir., 1960, 283 F.2d 817, 823. Earlier that Court stated that '* * * the Commission properly refers to circumstances under which an unconditional and permanent certificate might be issued notwithstanding the fact that the proposed price is out of line.' 283 F.2d 817, 821.
 
 
 31
 And this same theme was echoed by each of the other remanding Courts. 'It is conceivable' said the Tenth Circuit, 'that in some circumstances public convenience and necessity may require certificating of a sale when the price is 'out of line."[26] The D.C. Circuit pointed out alternative courses for the Commission where the 'prices * * * are suspiciously higher.' One course was to impose interim conditions. As to the other, it offered this solution. 'On the other hand, it (the Commission) may grant unconditional certification upon evidence sufficient to 'support a finding of public convenience and necessity."[27] We spoke in terms of burden making 'it * * * clearly incumbent on the proponent of (the proposed) rate to make some showing of the 'reason why' (as it was expressed in the CATCO opinion) * * *,' the proposed rate was a proper initial rate in view of rates half that high just a few years before.[28]
 
 
 32
 Evidence of the kind proffered by these petitioners bore upon these questions of public convenience and necessity. That the evidence would, in whole or in part, be pertinent to a 4 or 5 'just and reasonable' rate hearing is a matter of no decisive significance. If it proves too much, or proves too little, this is a matter calling for the expert evaluation and judgment of the Commission.[29] We have no fear that with resourceful ingenuity the Commission can develop procedural devices which will keep these 7 hearings from being bogged down into the full dress 4 or 5 rate hearing. Its awesome task calls for great administrative inventiveness which will assure to all, producer, consumer, and public alike, the full measure of statutory rights. Hill v. FPC, 5 Cir., 1964, 335 F.2d 355, n. 27, (July 23, 1964).[30]
 
 
 33
 The task facing the Commission in this developing field calls for innovation and adaptation. It is not, therefore, enough merely to inquire whether the price is 'in-line.' On the other hand, for 7 purposes, there need not be a full dress 4 or 5 rate hearing. The Commission must, however, hear and evaluate all relevant evidence bearing on public convenience and necessity when it is urged, or held,[31] that the proposed price is out of line.[32]
 
 III.
 Price Moratorium
 
 34
 So far as rates are concerned, the Commission did two principal things. First it conditioned the permanent certificate on a reduction of the initial rate to 18.5cents per Mcf. Second, it found that there was a triggering[33] at 23.55cents, and in order to prevent retriggering, it prohibited the producers from exercising their contract rights to file rate increases above 23.55cents until the conclusion of AR61-2 or July 1, 1967, whichever is earlier. That moratorium does permit, however, increases from 18.5cents up to 23.55cents.[34]
 
 
 35
 Although the Supreme Court stated that the 'extent of (the) power (to condition price changes) in permanent certification is not before us now,' we think the full import of its recent decision, reversing this Court, Federal Power Commission v. Hunt, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878, 886, compels a holding that the Natural Gas Act forbids a moratorium on price increases as a condition to the issuance of a permanent certificate.
 
 
 36
 Of course the statute gives the Commission the power to attach 'such reasonable terms and conditions' to the issuance of the certificate 'as the public convenience and necessity may require.' See footnote 13, supra. Literally, no distinction is made between temporary and permanent certificates. And undoubtedly there are a number of conditions which lawfully may be attached to the issuance of a permanent certificate.[35] But as the Court did there, when we examine the interplay between 7 on certification and 4 and 5 on 'just and reasonable' rates and rate changes, we think that Congress did not intend that the Commission have the power by a certificate condition to supersede the working of 4. By 4 Congress established a statutory scheme in which rates are prescribed and become effective by contractual provision. United Gas Pipeline Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373; United Gas Pipeline Co. v. Memphis Light, Gas & Water Division, 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.
 
 
 37
 There is no real question about the operative process or effect of 4(e). Subject only to suspension for a limited brief period of time and the obligation to refund on final determination, the rates prescribed in the contract become effective when filed. The only real problem is the point at which the rights of a producer and the powers of the Commission under 4 become applicable. This the Court answers squarely in Hunt. 'Under the procedures of the Act, it is at the point of permanent or unconditional temporary certification that the provisions of 4 become applicable.' 376 U.S. 515, 84 S.Ct. 861, at 866, 11 L.Ed.2d 878, at 884. It is at that point that 'the gas has been permanently certificated into interestate commerce * * *' and, the Court continues, at that point 'the independent producer is then free to pursue the rate filing procedure of that section.'
 
 
 38
 Other parts of the opinion make clear that the critical distinction is between the temporary, conditional certificate, on the one hand, and a permanent certificate on the other. Thus the Court points out, 'once a permanent certificate is granted, the Commission can correct an improper rate only under 5 of the Act * * *,' 376 U.S. 515, 84 S.Ct. 861, 865, 11 L.Ed.2d 878, 883. In view of the necessity for some character of certificate before the gas 'can move into interstate commerce' and the statutory right to apply 'for temporary authorization' the Court recognizes that '* * * the Commission must have the authority to condition a temporary certificate so as to avoid irreparable injury to affected parties.' But, the Court goes on, this '* * * condition, once imposed, continues only during the pendency of the producer's application for a permanent certificate.' 376 U.S. 515, 84 S.Ct. 861, 866, 11 L.Ed.2d 878, 884. And some of the more sweeping statements made in Catco[36] where reference was made to conditional certificates without indication as to permanent or temporary must now be read as conditional temporary certificates. For the Court, immediately preceding an extensive quotation from Catco, put its own characterization on the nature of the certificates being dealt with in Catco when it said, 'this Court previously discussed the use of the temporary certificate procedure in' Catco. 376 U.S. 515, 84 S.Ct. 861, 866, 11 L.Ed.2d 878, 884.
 
 
 39
 The correctness of our holding is demonstrated by the peculiar facts of this record. For applications filed in 1958,[37] the Commission asserts the power to compel the producer to sell gas for nearly ten years[38] at a price substantially less than the opening contract price and without the opportunity of being able to ever seek and obtain the automatic stepped up price increases provided for in the contract. Thus, for nearly half of the twenty-year contract period[39] through the guise of a 'price' condition, the Commission obtains an irrevocable dedication[40] of the gas to interstate sale and an effectual denial of any opportunity for the producer to exercise the legislative right to file, subject to suspension and refund, contractual rate increases. If the Commission may do it for half of the period, there is no reason why it may not do so for all. Congress could hardly have intended to delegate the power of legislative repeal by any such easy route.
 
 
 40
 Actually the Commission's argument for moratorium power harkens back to the like contention made to support exclusion of pertinent economic data discussed in Part II above. Here, as there, it insists that it must have the power to impose a price moratorium because the alternative is either to force a full blown 4 or 5 'just and reasonable' rate hearing, which is an unmanageable administrative problem, or exclude the needed gas from the market until such time as such a hearing can be conducted. But as there, we fail to see that it is a case of either or. If the kind of hearing which the particular facts of a particular application require[41] for determination of 'public convenience and necessity,' it is to be assumed that the Commission will issue a permanent certificate only if the initial contract price is in line or, if out of line, meets the statutory standard of public convenience and necessity. Full protection to the consumer is thereafter accorded so far as subsequent contract rate increases are concerned under the suspension and refund procedures of 4(e). If, in that situation, there might be some further triggering impact, then that would flow from the unique statutory scheme which Congress, not the Commission nor the Courts, are free to change no matter how unsound some might think it to be.
 
 
 41
 The Commission's brief recognizes that it 'is true that in CATCO, Texaco, Inc. v. FPC * * *, Atlantic Refining Co. v. FPC and California Oil Co. v. FPC cited by (certain of the petitioners) the Courts assumed that any rate increases contractually permitted could be filed under Section 4 at any time after operations were commenced under a certificate.'[42] But it treats these as judicial aberrations resulting presumably from a failure on the part of the Commission 'to meet its hold-the-line obligation by a moratorium condition.' This leads the Commission's counsel to claim the necessity for, and the existence of, a power to take whatever action, impose whatever conditions to assure that 'excessively high prices are absolutely prevented from being charged.' But no matter how commendable that policy may be, the Commission may not supersede 4 to accomplish it.
 
 IV.
 Retroactive Refunds
 
 42
 After fixing the initial price at 18.5cents per Mcf, the Commission in its conditions also required that the producers refund, with interest, the excess over that figure which had been collected under the judicially reversed unconditioned certificates.
 
 
 43
 The producers make three principal attacks on this refund order. The first one-- that the intervenor-distributors should have sought to stay gas deliveries pending determination in the respective Courts of Appeals[43] of their petitions for review-- has little merit. Quite apart from any problem of whether intervenor-distributors could have met applicable standards for a stay,[44] the producers' plight was not brought about by the failure of the petitioning intervenors to obtain a stay, but came from the action of the producers in making the deliveries under certificates which, though final, were then under direct judicial attack and subject as any competent Power Commission counsel would know, to the possibility of judicial reversal. The risk inherent in making deliveries pending final judicial determination was obvious to the producers. It was up to them to seek interim protective relief from the Commission, and there is no indication that extensions of time or other appropriate relief would have been declined by the Commission.
 
 
 44
 In the second attack some petitioners[45] apparently contend that the Commission could not order refunds because the original unconditioned certificates were not 'vacated' or 'set aside' by the Courts. Other petitioners urge the opposite-- no refund right because certificates were 'vacated.' The wording of the remand orders vary, those of the Ninth Circuit,[46] Tenth Circuit,[47] and this Circuit[48] spoke in terms of 'vacating' or 'setting aside,' whereas those in the D.C. Circuit[49] and the Third Circuit, following the Supreme Court's mandate,[50] spoke in terms of being remanded for further proceedings. But we agree with the Commission that by the choice of one rather than the other terminology, the remanding Courts intended no distinctive difference in effect.[51]
 
 
 45
 The third, and serious, attack made by all is that the operative effect of the refund is that of a reparation order.[52] Under the structure of the Act, it has long been recognized, and never questioned, that '* * * under the Act the Commission has no power to make reparation orders. And its power to fix rates admittedly is limited to those 'to be thereafter observed and in force." FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333.[53]
 
 
 46
 Although, as we point out shortly, these principles call for a special adaptation in the refund order, we think that the petitioners ignore the unusual circumstances of this case. By the remand orders (note 6, supra), all of the Courts of Appeals held that the unconditioned permanent certificates were improperly issued. It is one thing for a Court to rule that under a valid certificate the Commission lacks the power to retrospectively review rates and impose retroactive refund orders. It is quite another for a Court to conclude that a Commission lacking the power to do the former may yet not have inherent power to recapture the fruits obtained under an invalid, that is illegal, order. Thus, under the unique circumstances of this case, refunds are proper.[54]
 
 
 47
 We have here an unusual situation. On the one hand we hold that producers cannot carry the general principle forbidding reparational orders to the point where it permits them to retain, without question, what was obtained under invalid orders. That means that refunds of excess collections are required. But there is no reason why the producers should, in point of time, be required to refund the difference between the amount collected and the conditioned price as soon as it is determined. Refund at that point is not required to serve any public purpose, or reimburse consumers for excess charges. It may, however, impose irreparable loss to the producers. One public interest is, of course, against triggering. But in these five to six years any triggering effect has already taken place, and its impact has been felt. This clock cannot be turned back. As to consumers, they are ultimately entitled to a refund only to the extent that payments made here exceeded a 'just and reasonable' rate.
 
 
 48
 The problem then is to accommodate what we regard to be the inherent power of the Commission to prevent detriment to the consumers to the needs of this case. To balance the two it means that the refunds for collections made during this long period can be determined only after the 'just and reasonable' rate is fixed by an appropriate 4 or 5 proceeding.
 
 
 49
 Indeed, it is the operative impact of the policy against reparations, see note 53, supra, which makes this necessary. If the present refund order is affirmed, the producers must repay the difference between the conditioned price and the amount collected. In a 4 or 5 rate hearing, it may well, however, turn out the 'just and reasonable' rate is determined to be higher than the conditioned price.[55] But if the refunds have been made, that would be an empty ruling since there would be neither a legal right nor a practicable means for the producers to recapture that portion of the excessive refunds. Atlantic Seaboard Corp. v. FPC, 4 Cir., 1953, 201 F.2d 568, 572; Sohio Petroleum Co. v. FPC, 10 Cir., 1961, 298 F.2d 465, 467. The result, of course, would be that the consumers during the interim would have had gas at a rate less than 'just and reasonable.' No consumer is entitled under the statute to that. Nothing in the law should encourage that result or its possibility. And for it to occur means more than an undeserved windfall for favored customers. It means that other rate-payers are absorbing this deficiency and are therefore paying more than they should.
 
 
 50
 Such an approach is all the more required in view of the action which we take in remanding these cases for yet further hearings. Finding, as we do, significant procedural defects, we cannot sustain the conditioned price of 18.5cents. What that price will be, or whether there will be a price condition, must await the outcome of the further hearings. Refunds at the present time would be premature. At the same time this imposes no impossible administrative burden.[56] When and as the Commission on further hearings fixes the conditions, it can prescribe the necessary security to assure that the refunds, when ultimately fixed, will be paid and to or through the proper parties.
 
 
 51
 We agree that refunds can be required.[57] But to meet the exigencies of this unique case, they must be based, not on the conditioned price when fixed, but on the difference between the price collected and the rate found in a proper proceeding to be the 'just and reasonable' one.[58]
 
 V.
 The 'In-Line' Price Established
 
 52
 The petitioners assert that in arriving at the in-line price of 18.5cents, the Commission improperly excluded many higher, finally certificated prices, failed to give proper weight to prices approved by the Commission's own settlements in similar cases, and failed generally to give proper evaluation to the evidence showing contract prices from which to infer the 'in-line' price. This, and the petitioner's related contention, that the evidence demonstrated an in-line price not less than the contract price are matters on which we need not express any view. The remand for further hearing to receive all pertinent evidence, see Part II above, means that these aspects are likewise open for rehearing and redetermination.[59]
 
 VI.
 Take-or-Pay Provisions
 
 53
 In accordance with its earlier decision in Skelly, 1962, 28 FPC 401,[60] the Commission ordered that the take-or-pay provisions in the contracts should be subject prospectively to the Commission's future order in a pending rule-making proceeding, Docket No. R-199 with a provision that producers would not be required to file take-or-pay provisions for less than 80% Of the annual contract quantities.
 
 
 54
 Superior alone contends that for gas not delivered there is no sale, and therefore take-or-pay provisions are beyond the jurisdiction of the Commission under the exclusionary language of 1(b), 15 U.S.C.A. 717(b). When viewed realistically in the light of the imperative necessity for long term gas supply commitments, we agree with the Commission that this arrangement constitutes a sale within its power of regulation.
 
 
 55
 Under the peculiarities of this case with service having long ago been commenced and with no suggestion on the part of anyone that they wish to terminate it, we agree with the D.C. Circuit in its holding that this phase of the order does not presently present a reviewable matter. Public Service Corp. of New York v. FPC, D.C.Cir., 1964, 329 F.2d 242, 248; see also Humble Oil & Refining Co. v. FPC, 5 Cir., 1956, 236 F.2d 819, cert. denied, 1957, 352 U.S. 967, 77 S.Ct. 354, 1 L.Ed.2d 321.
 
 
 56
 The causes are therefore reversed and remanded to the Commission for other and further proceedings consistent with this opinion.
 
 
 57
 Reversed and remanded.
 
 
 
 [1]
 United Gas Improvement Co. v. FPC, 5 Cir., 1961, 290 F.2d 133, 138, 147 (dissenting opinion)
 
 
 [2]
 The certificate of the records shows that some of these ran as high as 10,000 pages, others 5,000 and 6,000. Counsel, with the responsible concern demonstrated by Federal Power practitioners, public and private, have reduced it to 617 printed pages under our special FPC practice which became the forerunner of our amended Rules 23 and 24. See Hunt v. FPC, 5 Cir., 1962, 306 F.2d 334, 336, n. 1. The 17 briefs exceed 480 additional pages
 
 
 [3]
 Atlantic Refining Company v. Public Service Commission of New York, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312
 
 
 [4]
 United Gas Improvement Co. v. FPC, 3 Cir., 1959, 269 F.2d 865
 
 
 [5]
 Sub nom. Public Service Commission of New York v. FPC, December 14, 1959, 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237
 
 
 [6]
 The original Commission opinions, and the court reversals are as follows (present petitioners shown in parentheses):
 (1) Transcontinental Gas Pipe Line Co., Op. 315, 1958, 20 FPC 264, aff'd sub nom. United Gas Improvement Co. v. FPC, 3 Cir., 1959, 269 F.2d 865, reversed mem. sub nom. Public Service Comm. of New York v. FPC, 1959, 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237 (Placid in No. 20891, Hill in No. 20892, and Frankel in No. 21028).
 (2) Texas Gas Transmission Corp., Op. 327, 1959, 22 FPC 378, reversed, Public Service Comm. of New York v. FPC, 1960, 109 U.S.App.D.C. 292, 287 F.2d 146, cert. denied, 1961, Shell Oil Co. v. Public Serv. Comm. of N.Y., 365 U.S. 880, 852, 81 S.Ct. 1030, 1031, 6 L.Ed.2d 192 (Callery in No. 20872, Sands in No. 20890, McDermott in No. 20967, and Ocean Drilling in No. 20989).
 (3) California Co., 1959, 22 FPC 252, reversed, United Gas Improvement Co. v. FPC, 9 Cir., 1960, 283 F.2d 817, cert. denied, 1961, Superior Oil Co. v. United Gas Imp. Co., 365 U.S. 879, 881, 81 S.Ct. 1030, 6 L.Ed.2d 191, 192 (Superior in No. 20885).
 (4) Sun Oil Co., 1959, 22 FPC 351, reversed, United Gas Improvement Co. v. FPC, 5 Cir., 1961, 290 F.2d 133, cert. denied, 1961, Sun Oil Co. v. United Gas Imp. Co., 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27.
 (5) Sunray Mid-Continent Oil Co., 1959, 22 FPC 361, reversed, United Gas Improvement Co. v. FPC, 10 Cir., 1961, 287 F.2d 159.
 (6) Superior Oil Co., 1959, 22 FPC 369, reversed, United Gas Improvement Co. v. FPC, 5 Cir., 1961, 290 F.2d 147, cert. denied, 1961, Superior Oil Co. v. United Gas Imp. Co., 366 U.S. 965, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (Superior in No. 20885).
 
 
 [7]
 Docket No. AR61-2, 26 Fed.Reg. 4296 (1961)
 The area pricing was initiated by Statement of General Policy No. 61-1, issued September 28, 1960. 24 FPC 818 (1960); 18 C.F.R. 2.56 (1961). By the First Amendment to Statement of General Policy No. 61-1, issued October 25, 1960, the FPC fixed an area price level of 21.5cents per Mcf plus tax reimbursement. 25 Fed.Reg. 10,488 (1960). Subsequently by the Fourth Amendment to Statement of General Policy No. 61-1, issued October 23, 1961, the FPC reduced the area price level for initial sales of gas from South Louisiana to 21.25cents per Mcf, inclusive of tax reimbursement. 26 Fed.Reg. 10,342 (1961).
 
 
 [8]
 Superior (our Case No. 20885-see Items (3), (6), note 6, supra, was not a party to this order
 
 
 [9]
 Petitions to review the refund-warning order of January 10, 1962, were dismissed by us 'without prejudice to the rights of petitioner to attack the validity of the orders * * * in petitions to review, * * * the orders of July 17, 1963, in the Commission's Opinion No. 398.'
 
 
 [10]
 The Examiner rejected a number of contentions of Staff and intervenor distributors, one of the Staff being that 'excess' payments made to the producers under 'take-or-pay' provisions for gas not delivered should be refunded
 
 
 [11]
 Refunds by Superior for collections under one temporary certificate prior to August 10, 1959, were excused based on the FPC's decision Skelly Oil Co. Op. 362, 1962, 28 FPC 401, subsequently reversed in Public Service Commission of New York v. FPC, D.C.Cir., 1964, 329 F.2d 242
 
 
 [12]
 The FPC rejected Staff's contentions on refund or take-or-pay prepayments, but it conditioned the certificates upon the ultimate outcome of a pending rulemaking proceeding, R-199, review of which was recently held to be premature by the D.C.Cir., 1964, 329 F.2d 242, 248
 
 
 [13]
 Section 7(e), 52 Stat. 824, as amended, 56 Stat. 84, 15 U.S.C.A. 717f(e) provides: '* * * (a) certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service * * * covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of * * * the Act and the requirements, rules and regulations of the Commission thereunder, and that the proposed service, sale, operation * * * to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.'
 
 
 [14]
 15 U.S.C.A. 717c
 '4(a) All rates and charges made, demanded, or received by any natural-gas company for * * * the transportation or sale of natural gas * * * shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
 ' * * * *unl
 '(c) Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission * * * schedules showing all rates and charges for any transporation or sale * * * together with all contracts which in any manner affect or relate to such rates, charges, classifications and services.
 '(d) Unless the Commission otherwise orders, no change shall be made * * * in any such rate * * * except after 30 days' notice to the Commission and to the public. * * *
 '(e) Whenever any such new schedule is filed the Commission shall have authority * * * to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing * * * may suspend the operation of such schedule * * * but not for a longer period than five months. * * * Where increased rates or charges are thus made effective, the Commission may * * * require the natural-gas company to furnish a bond * * * to refund, with interest, the portion of such increased rates or charges * * * found not justified. * * *'
 
 
 [15]
 15 U.S.C.A. 717d
 '5(a). Whenever the Commission, after a hearing * * * shall find that any rate, charge * * * collected by any natural-gas company * * * is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge * * * practice or contract to be thereafter observed and in force and shall fix the same by order: * * *; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.'
 
 
 [16]
 FPC v. Texaco, Inc., 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112
 
 
 [17]
 Rejecting the Respondent's claim that the Commission had used its power to prevent a levering upward of field prices to bar direct sales of gas, it said: 'Certainly such action would be contrary to our previous statements that the term 'public convenience and necessity,' connotes a flexible balancing process, in the course of which all the factors are weighed prior to final determination. United States v. Detroit & Cleveland Navigation Co., supra, 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38 n19. * * * as the Commission stated, 'countervailing factors suffice to tip the balance against the grant of the authority requested by Transco."
 Footnote 19 reads: 'n19. Compare the cases which have held that it was error for the Commission to refuse to consider certain factors within its power of notice. E.g., City of Pittsburg v. Federal Power Commission, 99 U.S.App.D.C. 113, 237 F.2d 741.'
 
 
 [18]
 Chief Judge Tuttle has pointed out: 'This is concededly a difficult standard to specify especially in light of the fact that producers are in reality selling gas which they own and are not, in the traditional sense, primarily furnishing a service to the public.' Gulf Oil Corp. v. FPC, 5 Cir., 1958, 255 F.2d 556, 557
 
 
 [19]
 United Gas Pipeline Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373
 
 
 [20]
 FPC v. Hunt, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878, 883
 
 
 [21]
 Several factors were mentioned just this term in FPC v. Hunt, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878. The Court there concluded that the purpose as revealed by the legislative history was to give the FPC 'an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure.'
 
 
 [22]
 See Morris, Recent Independent Producer Certificate Cases: The 'Suspect Order' Rule, 32 Geo.Wash.Law Rev. 489 (1964); Amerada Petroleum Corp., Op. No. 422, 1964, FPC (Nos. CI62-1544, March 23, 1964)
 
 
 [23]
 The 18.5cents per Mcf price fixed here was the figure previously determined to be appropriate in the remanded Catco case, 1962, 27 FPC 96. This line was actually a 1956 level
 The Commission forecasts that the area proceedings will result in just and reasonable rates. But it recognizes that '(to hold the line) does not mean that irrespective of evidence to the contrary an absolute price freeze is to be imposed until some future date when area proceedings ultimately establish 'just and reasonable' rates.'
 In re Amerada Petroleum Corp., Op. 422, 1964, FPC (Docket No. C 162-1544, March 23, 1964).
 
 
 [24]
 Indeed, the very nature of present and future public convenience and necessity forbids a look-back to 1956-57 only. The inquiry must include the time of the award. FCC v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656; Easton Publishing Co. v. FCC, 1950, 87 U.S.App.D.C. 344 185 F.2d 987, 991
 
 
 [25]
 See (3), note 6, supra
 
 
 [26]
 United Gas Improvement Co. v. FPC, 10 Cir., 1961, 287 F.2d 159, 163
 
 
 [27]
 Public Service Commission v. Federal Power Commission, 1960, 109 U.S.App.D.C. 292, 287 F.2d 146, 149. The Court then remanded as follows: 'The order, insofar as it grants unconditional certification ot the initial price proposals of the producer applicants, is reversed and the case is remanded to the Commission for further proceedings in which the producer applicants may, if they so choose, either augment the record so as to support a certification without price condition, or seek a certification appropriately conditioned.' 287 F.2d 146, at 150
 
 
 [28]
 United Gas Improvement Co. v. FPC, 5 Cir., 1961, 290 F.2d 133, 138
 
 
 [29]
 The argument that to receive evidence of this nature is to allow a producer a fair rate of return on excessive costs is a non sequitur. We agree with Judge Wright that 'The Commission is not required to subsidize high cost producers with consumers' money.' Atlantic Refining Co. v. FPC, 1963, 115 U.S.App.D.C. 26, 316 F.2d 677, 680. But whether costs are 'too high' or even 'high' are comparative factual matters calling for evidence and evaluation
 
 
 [30]
 Following the Supreme Court's lead in its admonition that the Commission must find ways to expedite proceedings, we there pointed out that much delay flows from an overuse of motions to dismiss instead of an evaluation of evidence for its intrinsic worth in the light of the Commission's expertise. The instant cases graphically illustrate that a motion to strike evidence relating to complex activities is an equally awkward procedural device of limited utility. For all we know, had the Commission received the proffered evidence, it would have held it to be wanting, and that might well have been the end of the matter. Now the case must go back and proceed through lengthy hearings, rehearings, exceptions, arguments before the Commission, rehearings and reargument to receive and evaluate this very evidence. In terms of time and the public interest, the apparent time-saving device of striking this evidence as irrelevant has proved again that the shortest way through is often the longest way around. Determining the utter and irretrievable irrelevance of a large body of evidence under the nuances of a concept as elusive as public convenience and necessity is indeed a summary procedure. And we have many times pointed out that summary procedures 'present a treacherous record for deciding issues of far-flung import, on which * * * (Courts) should draw inferences with caution from complicated courses of legislation * * * and practice.' Kennedy v. Silas Mason Co., 1948, 334 U.S. 249, 257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347; Chapman v. Hawthorne Flying Service, 5 Cir., 1961, 287 F.2d 539, 541
 
 
 [31]
 Nothing will keep the Commission from doing this by a two-step proceeding. See Hill v. FPC, supra. Indeed, this Court has recently approved separate trial by separate juries of validity-infringement on the one hand and damages on the other in patent cases. Swofford v. B. & W., Inc., 5 Cir., 1964, 336 F.2d 406, (July 28, 1964)
 
 
 [32]
 The evidence relating to cash outflow and replacement cost proffered and rejected in Public Service Commission of New York v. FPC, D.C.Cir., 1964, 329 F.2d 242, was much more limited than that here. Nor do we regard California Oil Co. v. FPC, 10 Cir., 1963, 315 F.2d 652 (inquiry as to what the line was); Atlantic Refining Co. v. FPC, 1963, 115 U.S.App.D.C. 26, 316 F.2d 677 (question of in-lineness stipulated to be sole issue), as holding contrary to our decision
 
 
 [33]
 Some of the proffered but rejected evidence, see Part II, supra, actually touched on the factual basis, or lack thereof, of the Catco assumption that 'new price plateaus will * * * be created.' 360 U.S. 378, at 390, 79 S.Ct. 1246, at 1254. We assume however, that there was a factual basis for the Commission's finding
 
 
 [34]
 The moratorium has a present impact. See, e.g., Superior's contract with United permitting escalation to 23.5cents plus 2.3cents tax reimbursement
 
 
 [35]
 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878, 885, n. 3
 
 
 [36]
 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312
 
 
 [37]
 The Placid and McDermott applications, filed September and December 1958, are typical. There were some as early as April 1957
 
 
 [38]
 The moratorium runs until July 1, 1967, or until any earlier final decision in AR61-2. AR61-2 is still going srtong. Its earlier counterpart, the Permian Basin hearing, AR61-1, is pending for decision before the Examiner. The briefs inform us that Chairman Swidler has stated that it will be March of 1965 before 61-1 is decided by the Examiner and the end of 1965 before 61-2 is forthcoming. Oil & Gas Journal 62 (March 16, 1964). A minimum of two years more will be required before they grind through Commission review to land in some Court of Appeals for judicial review. See Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357; FPC v. Texaco, 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112, 119, n. 13
 
 
 [39]
 Superior's contract with United covering Bayou Penchant and other leases in Terrebonne Parish and the November 1, 1957, contract between Hassie Hunt Trust and Transco appear to be typical
 
 
 [40]
 Since all petitioners have made sales, none is free to withdraw its reserves from dedication. J. M. Huber Corp. v. FPC, 3 Cir., 1956, 236 F.2d 550
 
 
 [41]
 There are no hard and fast rules. Adaptation is the order of the day in this undulating field. See Hill v. FPC, 5 Cir., 1964, 335 F.2d 355 (July 23, 1964)
 
 
 [42]
 Commission Br. 39. The cases referred to are: Catco, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312; Texaco, Inc. v. FPC, 5 Cir., 1961, 290 F.2d 149, 156; Atlantic Refining Co. v. FPC, 1963, 115 U.S.App.D.C. 26, 316 F.2d 677; California Oil Co. v. FPC, 10 Cir., 1963, 315 F.2d 652, 660; see also Willmut Gas & Oil Co. v. FPC, 1961, 111 U.S.App.D.C. 49, 294 F.2d 245
 
 
 [43]
 See note 6, supra
 
 
 [44]
 The intervenors stress, for example, Virginia Petroleum Jobbers Association v. FPC, 1958, 104 U.S.App.D.C. 106, 259 F.2d 921; Eastern Airlines, Inc. v. CAB, 2 Cir., 1958, 261 F.2d 830; Airport Commission of Forsyth County v. CAB, 4 Cir., 1961, 296 F.2d 95, 96; Associated Securities Corp. v. SEC, 10 Cir., 1960, 283 F.2d 773, 774-775; and Armour & Co. v. Freeman, 1962, 113 U.S.App.D.C. 37, 304 F.2d 404, 406-408, 418
 
 
 [45]
 See, e.g., No. 20989 (Ocean Drilling), No. 20872 (Callery), and No. 20891 (Placid)
 
 
 [46]
 283 F.2d 817, at 826
 
 
 [47]
 287 F.2d 159, at 163
 
 
 [48]
 290 F.2d 133, at 138; 290 F.2d 147, at 149
 
 
 [49]
 287 F.2d 146, at 150
 
 
 [50]
 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237
 
 
 [51]
 For reasons elucidated in Part II, we reject, however, the further contention of the Commission (Commission Br. 45-47) that 'price' was the only issue on the remand
 
 
 [52]
 As we indicated earlier (note 8, supra), Superior was not a party to the refund warning order of January 10, 1962. In our view, the order has no significance one way or the other
 
 
 [53]
 Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 1951, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912; Panhandle Eastern Pipe Line Co. v. FPC, 3 Cir., 1956, 236 F.2d 289, 292. The Supreme Court in T.I.M.E. v. United States, 1959, 359 U.S. 464, 469-470, 79 S.Ct. 904, 908, 3 L.Ed.2d 952, has recently said of Montana-Dakota: 'It was held that the Federal Power Act, which like the Motor Carrier Act expressly declares unreasonable rates to be 'unlawful,' does not create a cause of action for the recovery of allegedly unreasonable past rates. * * *'
 
 
 [54]
 In so holding we do not accept the Commission's argument that it has some general powers to protect public rights similar to that of the NLRB in reinstatement and back pay awards in unfair labor practice cases. The propriety of the refund here stands on the peculiar circumstances of this case
 
 
 [55]
 We agree with the Commission and the intervenor-distributors that in the 7 proceedings here ordered, the inquiry on public convenience and necessity is not synonymous with determination of 'just and reasonable' rate to be fixed under 4 or 5. This forces the conclusion that the conditioned price may well be different from the rate ultimately fixed
 
 
 [56]
 If, as the Commission contends, our ruling requires a 7 hearing bordering on a 4, 5 rate case, there is no reason why the Commission as to these particular cases does not consolidate with the remanded certification proceedings a 4 or 5 rate case. Consolidation has been ordered before, see, e.g., Texas Eastern Gas & Transmission Co. v. FPC, 5 Cir., 1962, 306 F.2d 345, 349, cert. denied, Manufacturers Light & Heat Co. v. Texas Eastern Transmission Corp., 1963, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273. Where these cases started out with 69 producer applicants, settlements have washed out all except these petitioners. As a precedent, our ruling is something less than the specter supposed, since the Commission, and many others including this Court, look with hope to the day when the area pricing procedure will supply most of the answers. Hunt v. FPC, 5 Cir., 1962, 306 F.2d 334, 343; Hill v. FPC, 5 Cir., 1964, 335 F.2d 355 (July 23, 1964); Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357
 
 
 [57]
 We think it inappropriate at this time to express any views as to interest or the rate, if interest is to be allowed
 
 
 [58]
 As to Frankel's petition (No. 21028) and Placid's contention as to sales from its well No. 1, Raceland Field, we need only say that, subject to the principles we have discussed as to refunds generally, we agree with the Commission that it is appropriate to require that these producers make whatever refunds are ultimately found to be due for collections made during the time of their respective operations
 As to Superior's petition, except for the Commission allowing a grace period up to August 10, 1959, for sales under one temporary certificate, not here challenged, though similar action was disapproved in Public Service Co. of New York v. FPC, D.C.Cir., 1964, 329 F.2d 242, 250, there appears to be no substantial difference between this record and the others.
 
 
 [59]
 It should be clear that all we say about the 'price' itself is equally applicable to the tax reimbursement element
 
 
 [60]
 Public Service Corp. of New York v. FPC, D.C.Cir., 1964, 329 F.2d 242